[723 NYS2d 134]

RICHBELL INFORMATION SERVICES, INC., et al., Appellants-
Respondents, v JUPITER PARTNERS L.P. et al., Respondents-
Appellants.

First Department, March 20, 2001

## APPEARANCES OF COUNSEL

*Charles E. Dorkey, III,* of counsel (*Thomas I. Sheridan, III, Steven R. Schoenfeld* and *David Sack* on the brief; *TORYS*, attorneys), for appellants-respondents.

*Elliot G. Sagor* of counsel (*Julie A. North, Howard W. Goldstein* and *Robert M. Osgood* on the brief; *Squadron, Ellenoff, Plesent & Sheinfeld, L. L. P.; Cravath, Swaine & Moore; Fried, Frank, Harris, Shriver & Jacobson* and *Sullivan & Cromwell,* attorneys), for respondents-appellants.

## OPINION OF THE COURT

ELLERIN, J.

In this action plaintiffs allege that defendants conspired by fraudulent and tortious conduct to misappropriate their interest in a joint venture and to ruin plaintiffs financially so as to prevent them from obtaining redress in the courts. The precise question on appeal is whether the complaint should have been dismissed on the ground that plaintiffs' assignment of their claims to an entity financially able to sustain the litigation violated Judiciary Law § 489. We hold that the motion to dismiss should have been denied because a determination as a matter of law that the assignment was champertous cannot be made on the record at this procedural juncture.

*The Allegedly Fraudulent Scheme*

Plaintiff David Elias, a citizen of the United Kingdom, owns and controls plaintiff The Richbell Group Limited (Richbell Group), which owns, *inter alia*, plaintiff Richbell Information Services, Inc. (RIS). In 1994 Richbell Group, and defendants Jupiter Partners L.P. (Jupiter) and RIT Capital Partners plc (RIT) formed H-G Holdings, Inc. (H-G), a corporate vehicle for carrying out a joint venture to acquire Gelco Payment Systems, Inc. (Gelco) and combine it with The Harpur Group Limited (Harpur), which was then owned indirectly by Elias and Richbell Group. Harpur's primary business was the operation and processing of corporate charge cards for fuel for company car fleets. Gelco offered expense and payment processing and management information services.

Plaintiffs allege that, in early 1996, despite the fact that their performance had earned them the right to an increase in

their share of H-G, Jupiter determined to force them to accept a smaller share. Knowing that plaintiffs needed the funds to meet other financial obligations, Jupiter blocked an initial public offering (IPO) of H-G's shares, even while acknowledging that an IPO was in the best interests of H-G and its stockholders, and refused to allow plaintiffs to sell or borrow against their H-G shares. In April 1996, to break the impasse, plaintiffs entered into an agreement with Jupiter and RIT (the April 1996 Agreement) pursuant to which the parties would proceed with the IPO within six to nine months, and, pending the IPO, RIT, through its wholly owned and controlled subsidiary defendant Atlantic and General Investment Trust Limited (AGIT), would provide plaintiffs with a $30 million bridge loan, secured by RIS's H-G shares, which allegedly were worth more than $240 million at the time. Plaintiffs also agreed to reduce their equity holding in H-G, which increased Jupiter's equity holding by the same amount, and to pay interest on the loan of 25 per cent per annum.

Jupiter and, later, RIT then allegedly orchestrated plaintiffs' eventual default on the loan by continuing to block the H-G IPO in violation of the April 1996 Agreement, by delaying, until after the due date of the loan, the closing on the sale of certain H-G assets from which plaintiffs would have received more than they needed to satisfy the loan, and by entering into a secret bid-rigging agreement to assure that, upon plaintiffs' default, Jupiter and RIT would purchase RIS's shares in H-G for the artificially low price of the amount due on the loan, thereby depriving plaintiffs of more than $200 million of equity in H-G.

Plaintiffs commenced this action in November 1997 alleging 12 causes of action for fraudulent inducement, breach of contract, breach of fiduciary duty, promissory estoppel, tortious interference with contract, interference with prospective advantage, conversion, and corporate waste. In February 1998, defendants moved to dismiss the complaint. Plaintiffs' counsel refused to defend the motion unless its fees were paid, and successfully cross-moved to be relieved.

*Financing the Suit*

With plaintiffs unable to finance the suit themselves, on April 24, 1998, a committee of individuals who had invested in Richbell Group companies sent a circular soliciting funds for the litigation to the shareholders and creditors of Richbell Information Holdings, Inc. (RIH) and Verulam Group Limited. RIH owned stock in the parent company of plaintiff RIS, and Veru-

lam owned stock in RIH. Their shareholders and creditors, according to plaintiffs, were invited to invest in Richbell 1998 to protect their interests in these Richbell Group companies, which they stood to lose if this action were not successful. The investors would control the litigation and share in its proceeds on a priority basis through a company formed for these purposes and eventually named Richbell 1998 Ltd. The circular suggested that, as an incentive to contribute, investors would receive repayment of the costs of the litigation funding, "together with a premium equal to 20 times such funding."

Their shareholders and creditors, according to plaintiffs, were invited to protect their interests in these Richbell Group companies, which they stood to lose if this action were not successful, by investing in a company formed for this purpose and eventually named Richbell 1998 Ltd. The investors would control the litigation and share in its proceeds on a priority basis through Richbell 1998. On the same day, the Board of Directors of RIS approved a similar assignment of its interests to Richbell 1998, and had drafts prepared of an agreement between Richbell 1998 and RIS (the RIS Agreement) and an agreement between Richbell 1998 and plaintiffs (the Multi-Party Agreement). However, RIS was required to apply to the English High Court of Justice for approval of the funding agreements, since it was in bankruptcy in the United Kingdom and a liquidator had not yet been appointed. In an affidavit to the High Court, Malcolm Sweeting, a member of the Steering Committee set up to represent the interests of investors in Richbell Group companies, stated that Richbell 1998 "was formed solely for the purpose of acting as a clean vehicle for the Investors to acquire the interests of [RIS], [Richbell Group] and Mr. Elias in the US Action, and to progress those proceedings." Peter Stuart-Buttle, a director of RIS, stated in an affidavit that the investors had made it clear to him that they would not continue to fund the litigation unless they received a proportionate share of its proceeds. AGIT opposed the application on the ground, *inter alia*, that an assignment would violate Judiciary Law § 489. On July 17, 1998, the High Court approved an alternative funding arrangement that was not an assignment, expressly leaving open the question of whether the arrangement violated United States or United Kingdom champerty laws.

The High Court had ordered Richbell Group liquidated in March 1998, upon a petition filed by defendant Harpur, and in October 1998 the appointed liquidators executed an "Assign-

ment Agreement" transferring Richbell Group's claims to Richbell 1998. The RIS Agreement and the Multi-Party Agreement were executed in December. The latter provided that any money or other assets recovered in this action by Richbell, Elias, and RIS, after it paid its creditors, would be placed into a trust for the benefit of, and promptly paid to, Richbell 1998. From the trust, Richbell Group would receive 15 per cent of the first $50 million, 10 per cent of amounts between $50 million and $75 million, and 5 per cent of amounts higher than that. Elias then would receive 5 per cent, and the balance would be distributed as follows: first, the funding investors would receive the return of their investment with 5 per cent interest per annum; next, the funding investors would receive an unspecified bonus percentage of their contribution; third, the funding investors would receive 45 pence for each share in RIH or Verulam or £1 of loan stock; fourth, the funding investors would receive 40 pence for each share in RIH or Verulam or £1 of loan stock and non-funding investors (other than Elias) would receive 85 pence for each share in RIH or £1 of loan stock; fifth, Elias would receive 85 pence for each share held by Richbell Group in RIH; and finally, the remainder would be distributed to funding and non-funding investors in proportion to their holdings of shares in RIH or loan stocks and to Elias in proportion to the shares held by Richbell Group in RIH.

With the funds Richbell 1998 had advanced after the Elias assignment of June 1998, plaintiffs engaged new counsel who served an amended complaint in September 1998, now asserting 33 causes of action. Defendants moved to dismiss pursuant to CPLR 3211 and Judiciary Law § 489.

*The Motion to Dismiss.*

Supreme Court granted defendants' motion to dismiss the amended complaint pursuant to Judiciary Law § 489, in an order entered August 6, 1999. The court found that, in violation of the statute, "the sole or primary purpose of the creation of Richbell 1998 Limited and the assignment of the claims thereto was to pursue this action," as numerous individuals involved in the assignment had acknowledged. The court quoted from Sweeting's affidavit ("[t]he Assignee was formed solely for the purpose of acting as a clean vehicle for the Investors to acquire the interests of the Company, RGL and Mr. Elias in the US Action, and to progress those proceedings"), and from the affidavit that Elias submitted to the High Court:

"[A] strategy has been devised to ensure that the

litigation can be continued in order that it will realise at the very least US $240 million. This strategy involves the incorporation of a new company, Richbell 1998 Limited which will be funded by minority investors in The Richbell Group generally. Richbell 1998 Limited will take an assignment of the Richbell Group Limited's cause of action in the American proceedings. As part of the proposed deal, The Richbell Group Limited will pay to Richbell 1998 Limited approximately 85% of the proceeds of the litigation, the remaining 15% being paid to the liquidators of The Richbell Group Limited."

The court rejected the argument that the assignment did not violate section 489 because it was made after the litigation was commenced, on the ground that "the concern is not *when* the assignment took place, but *why* the assignment occurred at all" ([emphasis in original] citing *Koro Co. v Bristol-Myers Co.*, 568 F Supp 280, 288 ["the critical inquiry is whether the assignment was made for the *exclusive purpose* of bringing an action on the claim"]). The court observed that the amended complaint filed subsequent to the assignment was more than three times as long as the original complaint and alleged 21 new causes of action and that the assertion of new claims against defendants based on the assignment was exactly what section 489 was intended to avoid.

The court also rejected the argument that the assignments by Elias and RIS were made in the context of bankruptcy proceedings and thus fell within section 489's bankruptcy exception, on the ground that they were made not by any executor, administrator or assignee but by Elias and RIS directly, before bankruptcy had been declared. (The High Court declared Elias bankrupt in November 1998.) The Richbell Group assignment, however, had been signed by Richbell Group's liquidators, and was within the exception, and the court held that plaintiffs could pursue claims arising from that assignment without violating section 489. The court granted plaintiffs leave to serve an amended complaint repleading the 12 causes of action asserted in the original complaint and any additional causes of action arising from the assignment by Richbell Group that did not violate section 489.

Plaintiffs' second amended complaint was virtually identical to the dismissed amended complaint, except that each of the 25 remaining causes of action was accompanied by a note

explaining its basis in one of the 12 causes of action asserted in the original complaint. Defendants moved to dismiss on the ground, *inter alia*, that the second amended complaint violated the August 6, 1999 order. Plaintiffs cross-moved to renew and reconsider based on events subsequent to the August 6, 1999 order that allegedly cured their section 489 violation. Elias's liquidator had signed a "Deed of Adherence and Assignment" on August 26, 1999, which transferred Elias's claims to Richbell 1998. On their motion to renew and reconsider, plaintiffs submitted that deed and an unsigned "Deed of Adherence" to be signed by RIS's liquidator upon approval by the High Court. After the High Court approved the RIS funding arrangement and RIS's liquidators executed the Deed of Adherence, plaintiffs moved to supplement the record on the motion to renew to include the High Court order and the executed Deed of Adherence.

In an order entered April 10, 2000, Supreme Court granted defendants' motion to dismiss the second amended complaint on the ground that plaintiffs had failed to comply with its August 6, 1999 order. Their second amended complaint was "strikingly similar" to the first amended complaint in that it contained additional causes of action not originally pleaded before the assignment was made. However, the court again granted plaintiffs leave to replead the 12 causes of action asserted in the original complaint and any additional causes of action arising from the Richbell Group assignment. The court denied plaintiffs' motion to renew and reconsider, and, in an order entered May 18, 2000, denied as moot plaintiffs' motion to supplement the record on their motion for renewal and reconsideration. Plaintiffs appeal from the August 6, 1999, April 10, 2000, and May 18, 2000 orders. Defendants cross-appeal from that portion of the August 6, 1999 order that granted plaintiffs leave to replead the 12 causes of action asserted in the original complaint.

*Discussion*

Section 489 provides, in pertinent part:

> "No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, prom-

issory note, bill of exchange, book debt, or other thing in action, or any claim or demand, *with the intent and for the purpose of bringing an action or proceeding thereon*; provided however, that bills receivable, notes receivable, bills of exchange, judgments or other things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise" (emphasis added).

The courts historically have interpreted the proscription of section 489 as a narrow one. In its seminal champerty case, *Moses v McDivitt* (88 NY 62), the Court of Appeals announced that the language, "with the intent and for the purpose,"

"is significant and indicates that a mere intent to bring a suit on a claim purchased does not constitute the offense; the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose" (at 65).

In that case, the Court found that the primary purpose of the plaintiff attorney's purchase of a bond and mortgage was to coerce the debtor into transferring stock to him, which, "whether honest or reprehensible," was not prohibited by the statute (*id.* at 67). Rather, the object of the statute, a predecessor to section 489, was "to prevent attorneys, etc., from purchasing things in action *for the purpose of obtaining costs by the prosecution thereof*, and it was not intended to prevent a purchase *for the purpose of protecting some other right of the assignee*" (*id.* at 65 [emphasis added], citing *Baldwin v Latson*, 2 Barb Ch 306).

In its subsequent champerty cases, *Sprung v Jaffe* (3 NY2d 539 [reversing grant of summary judgment to plaintiff assignee of debt instrument on ground that plaintiff failed to provide proof of purpose of acquisition of debt instrument other than bringing suit]); *Fairchild Hiller Corp. v McDonnell Douglas Corp.* (28 NY2d 325 [affirming dismissal of affirmative defense of champerty on ground that claim was assigned as incidental part of substantial commercial transaction]); and *Bluebird Partners v First Fid. Bank* (94 NY2d 726 [reversing dismissal of complaint on ground of question of fact as to primary purpose of plaintiff's acquisition of certain certificates in a debt offer-

ing]), the Court has quoted *Moses (supra)* to the effect that "[t]o constitute the offense the primary purpose of the purchase must be to enable him to bring a suit, and the intent to bring a suit must not be merely incidental and contingent" (88 NY at 65). As this Court has expressed it, section 489 prohibits an "acquisition of a cause of action by a stranger to the underlying dispute" (*Jamaica Pub. Serv. Co. v La Interamericana Compania De Seguros Generales*, 262 AD2d 73, 74) "in consideration of a bargain for some part of the thing involved" (*Coopers & Lybrand v Levitt*, 52 AD2d 493, 497). Thus, the question here is whether the investors are, as defendants allege, strangers to the dispute merely speculating on the suit or, as plaintiffs allege, parties seeking to protect interests of theirs that are financially related to plaintiffs' interests.

In *Bluebird (supra)*, the Court observed that "while this Court has been willing to find that an action is *not* champertous as a matter of law [citations omitted], it has been hesitant to find that an action *is champertous as a matter of law*" (94 NY2d at 734-735; emphasis in original), and affirmed the propriety of this prudent approach "in the modern setting of sophisticated financial transactions and complicated investment strategies" (*id.* at 734). In that case, the Court found that it was impossible to determine on the record whether the acquisition of claims against the defendant was an incidental part of the plaintiff's purchase of the debt offering certificates or the driving force behind it, and cautioned that, "[c]onsidering the narrow purposes of champerty and the tangled context of this case, we would not make this determination lightly" (*id.* at 739).

Equally, it is no trivial matter to tease out of the tangled context of the case before us the primary purpose of the assignment of plaintiffs' claims to the investors through the funding agreements. Defendants argue that the record "could not be clearer" that the primary purpose of the investors in acquiring the claims from Elias and RIS was to pursue litigation, but we conclude, as the Court in *Bluebird* concluded, that "this case boils down to a weighing of evidence or a credibility determination, albeit within subsets of uncontested facts" (94 NY2d at 738).

Defendants contend that Sweeting's statement in his affidavit to the High Court that Richbell 1998 "was formed *solely* for the purpose of * * * acquir[ing] the interests of [plaintiffs], and to progress those proceedings" (emphasis supplied by defendants) is a "judicial admission" that "ends the need for

further analysis." In the same affidavit, however, Sweeting also states:

> "Directly or indirectly through Richbell group companies, the Investors had invested in The Harpur Group Limited ('Harpur'), which was a commercial success. Harpur was put into a joint venture, and that joint venture has also been a commercial success: Harpur-Gelco Holdings Inc. ('H-G') nearly trebled its profits. The Harpur Group Limited was sold earlier this year for US\$ 186 million plus a further US\$ 20 million in deferred consideration, but it is suggested that the Investors are to receive no value from that sale as a result of the events which are presently the subject of the US Action.

> "Success in the US Action represents the only prospect of a source of payment to the Company's creditors (including AGIT). However, the Company has no realistic prospect of funding those proceedings other than funding from the Investors.

> "The Investors are: i) minority shareholders in Richbell Information Holdings Limited ('RIH') and/or Verulam Group Limited; and/or ii) holders of loan stock issued by various companies in the Group, namely: a) RIH Secured Debenture Stock 1997; b) Richbell Finance Loan Stock 1995; c) Verulam Deep Discount Loan Stock; d) Verulam Variable Return Loan Stock; e) Verulam Zero Coupon Loan Stock.

> "I confirm that all of the Investors have an economic interest in the outcome of the US Action. Those of the Investors who hold Loan Stock are also creditors of companies in the Group.

> "The Investors believe that the Company's claims in the US Action have merit and are likely to lead to a significant recovery in due course. The measure of their confidence is the fact that they are prepared to fund the litigation but only receive a benefit after the legitimate claims of the Company's creditors have been met. However, if the Court does not validate the transaction, it appears that the Company and its creditors must lose this potentially valuable asset."

Defendants claim that the investors' "primary litigious intent" can also be seen in the fact that the only assets that were the subject of the three funding agreements were plaintiffs' claims against defendants. They argue that the investors' purpose could not have been the protection of their own financial interests, since, as the investors concede, they never owned stock in RIS directly. Defendants contend that, if the investors' motive truly was the protection of their own interests, they would not have had to be "incentivised" by the promise of a bonus percentage of their contribution. Thus the record allegedly demonstrates that the investors' intent in purchasing plaintiffs' claims was speculative. Defendants argue that Judiciary Law § 489 is designed to limit the prosecution of claims to parties with a direct interest in those claims, and that, given the remoteness of their claims from plaintiffs' claims, the investors are not such parties.

However, while they seek to denigrate the investors' relationship to the claim to H-G's assets as "attenuated," "absurd," and remote by "six degrees of separation," defendants acknowledge that "(1) The so-called 'pre-existing investors' (2) hold stock in a company (Verulam) that (3) has an interest in a company (RIH) that (4) has an interest in a company (RIS Investments Limited) that (5) has an interest in Appellant RIS that, finally, (6) has asserted claims based on its investment in H-G." Moreover, only shareholders in and holders of loan stock issued by Richbell Group companies were approached to invest. Given that the value of their interests allegedly depends on the viability of Elias and the Richbell Group companies and therefore on the outcome of this suit, we cannot conclude that, absent those interests, they would have agreed to fund this suit. While defendants infer a speculative intent from the fact that a percentage of the benefit of the litigation, if successful, was promised to the investors as an incentive to invest, Sweeting asserts that the purpose of the incentive arrangement is "to acknowledge that certain of the Investors, who would not have the financial means to become Funding Investors, would nevertheless be entitled to a share in the Total Recoveries depending on the amount of the Total Recoveries." This purpose is also stated in the offering circular, which proposed to fund and pursue the litigation "for the benefit of all shareholders and loan stock holders of the Richbell Group companies." Moreover, the dual purpose to which Sweeting refers in his affidavit of benefiting the creditors of RIS as well as the participating and non-participating investors is also reflected in the RIS Agreement:

"Richbell 1998 has been established as a nominee by investors in the Richbell Group (who have a financial interest in preserving and pursuing the claims which are the subject of the Litigation) and are willing to fund the future conduct of the Litigation with a view to enhancing the returns from such Litigation for the benefit of both the creditors and contributors of RIS and investors contributing to Richbell 1998."

Under the circumstances, questions of fact exist as to whether Richbell 1998 is a stranger and whether the funding agreements were designed to preserve investments in the Richbell Group companies that would be wiped out if the suit were not successful and the Elias pyramid collapsed. We therefore cannot find as a matter of law that the sole purpose of the assignments was to prosecute the suit or that the funding agreements conflict with the purpose of section 489.

Accordingly, the order of the Supreme Court, New York County (Barry Cozier, J.), entered August 6, 1999, insofar as it granted defendants' motion to dismiss the amended complaint pursuant to Judiciary Law § 489, should be reversed, on the law, without costs, the motion denied and the complaint reinstated. Appeals from orders, same court and Justice, entered April 10, 2000 and May 18, 2000, should be dismissed, without costs, as academic in view of the foregoing.

NARDELLI, J. P., WILLIAMS, LERNER and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered August 6, 1999, reversed, on the law, without costs, and defendants' motion to dismiss the amended complaint pursuant to Judiciary Law § 489 denied and the complaint reinstated. Appeals from orders, same court, entered April 10, 2000 and May 18, 2000, dismissed, without costs, as academic.