OPINION OF THE COURT
 

 Bellacosa, J.
 

 Champerty is a venerable doctrine developed hundreds of years ago to prevent or curtail the commercialization of or trading in litigation. It is currently codified in New York as Judiciary Law § 489. In this case, the statute’s evocation as an affirmative defense attempts to squeeze the ancient prohibition into a modern financial transaction and its resulting dispute.
 

 Bluebird Partners, L.P. brings this action, essentially alleging a breach of fiduciary duty against various trustees involved in the bankruptcy of Continental Airlines, Inc. The question before us, initially raised by United Jersey Bank (UJB) in a motion to dismiss, is whether Bluebird engaged in champerty when it purchased the second series certificates in question. The Appellate Division found that the primary purpose was champertous and dismissed the complaint as against UJB on that ground, as a matter of law.
 

 We reverse the order of the Appellate Division and reinstate the champerty-contested aspect of Bluebird’s complaint. Neither the history of the doctrine nor the case law of this Court support a matter of law application of the champerty doctrine to the acquisition of rights to claims that are integrated within the sophisticated market transactions like these.
 

 I.
 

 This action, Bluebird’s fifth overall, was commenced in March 1997. All defendants moved jointly to dismiss the complaint. UJB filed an additional motion to dismiss the complaint as against it on champerty grounds and requested that this separate motion be treated as one for summary judgment. After considerable procedural meanderings, Supreme Court eventually denied UJB’s separate champerty motion.
 

 The Appellate Division unanimously reversed Supreme Court’s denial of UJB’s champerty motion, granted that motion, and dismissed the complaint as against UJB, stating:
 

 “even were we to accept plaintiffs assertion that it
 
 *730
 
 began purchasing the second series certificates in order to gain leverage for the settlement of an unrelated lawsuit, it admittedly continued to purchase more such certificates in large quantities for nearly two years after that litigation was settled. The record leaves no doubt that plaintiffs ‘primary purpose’ * * * in purchasing those certificates was the maintenance of this litigation against the second series trustee, and, accordingly, the complaint should have been dismissed as against it on the ground of champerty (Judiciary Law § 489) as a matter of law”
 
 (Bluebird Partners v First Fid. Bank,
 
 259 AD2d 273, 274 [citations omitted]).
 

 This Court granted Bluebird leave to appeal only with respect to UJB’s motion premised on champerty.
 

 This suit arises as a result of events related to Continental Airlines’ bankruptcy, a chapter 11 reorganization. The bankruptcy was filed on December 3, 1990, and Continental’s Plan of Reorganization was confirmed on April 16, 1993. The certificate purchases by Bluebird at issue occurred after this period, but it is impossible to understand the import of the parties’ assertions without some appreciation of the events that occurred prior to and during Continental’s bankruptcy.
 

 On March 15, 1987, Continental Airlines and four trustees entered into a Secured Equipment Indenture and Lease Agreement, pursuant to which Continental issued a $350 million debt offering, secured by collateral. The offering consisted of three series of certificates, with first series certificate holders having priority for payment over second series holders, who in turn had priority over third series certificate holders.
 

 Pursuant to the Agreement, the four trustees protected the interests of the certificate holders. A collateral trustee monitored the over-all interest in the collateral, and separate trustees represented the holders of each of the three series. UJB was the original trustee for the second series certificates.
 

 Continental filed its chapter 11 petition in December 1990. At that time, there existed a total outstanding obligation pursuant to the three certificate offerings of over $180 million, the collateral was worth approximately that same amount.
 

 Shortly before confirmation of Continental’s Reorganization Plan, the successor to UJB as second series trustee filed a lawsuit challenging the priority rules of the Indenture Agreement. This priority action sought a declaration that all certifi
 
 *731
 
 cate holders would share equally in all consideration received by the collateral trustee, rather than in declining order of priority pursuant to the Indenture Agreement.
 

 By the time Continental emerged from bankruptcy in April 1993, the value of the collateral had declined to an approximate value of less than $50 million. This amount was not enough to compensate fully even the first series certificate holders. The Bankruptcy Court found that the trustees had failed to take available measures to preserve the interests of the “secured” creditors and denied the trustees’ motion for compensation for lost value of $119 million. This purported failure constitutes the basis of the breach of duty claims against the trustees.
 

 The trustees appealed that Bankruptcy Court decision. Various Federal appeals ensued between April 1993 and January 6, 1997, when, finally, the United States Supreme Court denied certiorari
 
 (Bank of N. Y. v Continental Airlines,
 
 519 US 1057). This result ended any hopes or expectations of recovering the full value of the collateral.
 

 In the interim, the priority action remained pending. The collateral trustee would only distribute to the first series certificate holders the pro rata share they would receive if the priority action succeeded, rather than the larger recovery to which they were entitled pursuant to the Indenture Agreement. The withholding of funds made it apparent that any possible further recovery on the first series certificates would not occur until the priority action was resolved.
 

 Also in the interim, on January 14, 1994, Gabriel Capital, L.P. and its affiliates, a variety of investment-related limited partnerships, formed Bluebird, with Gabriel Capital as its general partner. From 1991 to early 1993, Gabriel and its affiliates had purchased approximately $70 million worth of Continental’s outstanding first series certificates. The cost, though, was approximately $26 million — a massive discount from face value due to the pending bankruptcy. In January 1994, Gabriel and its affiliates transferred their Continental first series certificates to Bluebird.
 

 Beyond acquiring the first series certificates, Bluebird also made several purchases of second series certificates from January 28, 1994 through June 26, 1996, at significantly reduced prices: between January 28 and February 24, 1994, Bluebird purchased a total of $28,995,000 worth of the outstanding second series certificates for a cost of approximately $577,000 (an average cost of two cents on the dollar); on November 9,
 
 *732
 
 1994, Bluebird purchased $1.5 million worth of second series certificates for $13,125 (.875 cents on the dollar); on December 20, 1995, Bluebird purchased $8 million worth of second series certificates for $50,000 (.625 cents on the dollar); and, in June 1996, Bluebird purchased $1.8 million worth of second series certificates at a cost of only $4,500 (approximately .25 cents on the dollar).
 

 Jack Mayer, a research analyst with one of the Gabriel affiliates, testified at a deposition that he requested that the broker make the January 1994 purchases “with all legal right or rights” because he didn’t want any question as to whether Bluebird had acquired such rights when it purchased the certificates. The trade ticket for the February 1994 purchase of second series certificates bore a similar notation. When asked whether he purchased these second series certificates with the idea of suing the second series trustee because of its conduct during the Continental bankruptcy, Mayer responded, “I certainly considered that I might sue them. I certainly considered that that’s an aspect of it.” The analyst added that at the time of the purchase of second series certificates in January 1994, he knew that a lawsuit against the second series trustee was “the direction we were certainly headed in. No question about that.”
 

 Mayer also specifically testified that he bought the second series certificates for two reasons:
 

 “Basically, there was this priority action. And I did think that as a practical matter in order to settle it that one would have to give the Second Series bonds something. * * * Number two, if I were to embark on a course of buying more of these at some point, I would be in a position to direct the Second Series trustee if I thought that that was desirable and/or I would come to a point where it was economically indifferent to me that the priority action was settled.”
 

 Next, Bluebird filed its first complaint against UJB in Federal court, asserting breaches of fiduciary duty. Subsequently, in June 1994, Bluebird consented to a priority action settlement in the range of three to four cents on the dollar. The settlement was not finalized immediately, and by the time the settlement agreement was approved by the Bankruptcy Court on December 28, 1995, approximately .68 cents on the dollar was paid to second series certificate holders.
 

 
 *733
 
 Eventually, Bluebird’s Federal breach of duty complaint was dismissed. Bluebird then filed a complaint, including claims against UJB, in State court in January 1996. The complaint in this action — Bluebird’s third against UJB — was filed approximately a year later, in March 1997.
 

 When UJB made its champerty move in this last action at Supreme Court, Bluebird did not cross-move. Relying on the evidence provided by UJB, such as the deposition testimony of Mr. Mayer, Bluebird asserted that the only relevant evidence shows that Bluebird had valid business reasons for making the second series purchases, that the primary purpose of purchase was not to sue on the certificates, and that, at a minimum, disputed issues of fact concerning the champerty contention are involved here.
 

 Supreme Court agreed that questions of material fact existed when it addressed UJB’s champerty defensive shield. The Appellate Division, however, found no issues of fact and dismissed the complaint against UJB on the champerty ground as a matter of law. We disagree with the Appellate Division for the reasons next set forth.
 

 II.
 

 Judiciary Law § 489, provides in pertinent part:
 

 “Purchase of claims by corporations or collection agencies
 

 “No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand,
 
 with the intent and for the purpose of bringing an action or proceeding
 
 thereon” (emphasis added).
 

 The “champerty” concept is based on a type of French feudal tenure in land, a “champart,” in which the fee for use of the land was neither in money nor ordinary service in kind. The tenant-by-champart was a partial owner of the land bound to share any rents and profits with the grantor, but the grantor took the risk that the crops might fail and that there would be no return. Anyone who then obtained a legal interest in that
 
 *734
 
 grant of land would also take a share of the profits in champart (see, Radin,
 
 Maintenance By Champerty,
 
 24 Cal L Rev 48, 61-62 [1935]).
 

 “Champerty,” as a term of art, grew out of this practice to describe the medieval situation where someone bought an interest in a claim Under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded. The most important litigation of that era was over land, and a person who bought lawsuits could acquire a partial interest in landed estates — an estimable power play. The taint on the process arose because the purchase price was usually far below the value of the potential land acquisition — a transaction suffused with speculation related to the “sin” of usury and its concomitant legal prohibitions. The champerty transaction, however, evaded the strict prohibitive laws involving usury
 
 (see, id.,
 
 at 60-61, 67).
 

 Even as the feudal system faded, English law retained the word “champart” as a metaphor to indicate a disapproval of lawsuits brought “for part of the profits” of the action
 
 (see, id.,
 
 at 63;
 
 see also,
 
 Winfield,
 
 The History of Maintenance and Champerty,
 
 35 LQ Rev 50 [1919]). Because lawyers were usually the instruments of such practices, “champertors [were] nearly always lawyers”
 
 (see,
 
 Radin,
 
 op. cit.,
 
 at 66).
 

 Indeed, early New York cases indicate that the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, which, at the time, included attorneys’ fees
 
 (see, Elliott Assocs. v Banco de la Nacion,
 
 194 F3d 363, 372-373 [2d Cir 1999]). Consistent with this limited purpose, New York’s early statutory prohibitions against champerty, found in the Revised Statutes and then in the Code of Civil Procedure, were specifically addressed to lawyers
 
 (see, Irwin v Curie,
 
 171 NY 409, 411-412 [1902]). However, in 1907, the prohibitions were extended to nonlawyers and corporations
 
 (see,
 
 Code of Civil Procedure § 77 [1907]).
 

 These provisions were consolidated into the Penal Law in 1909 and then moved to the Judiciary Law in 1965. It is with this history in mind that we resolve the summary judgment application of the conventional notion of champerty in the modern setting of sophisticated financial transactions and complicated investment strategies.
 

 This Court’s jurisprudence demonstrates that while this Court has been willing to find that an action is
 
 not
 
 champertous
 
 *735
 
 as a matter of law
 
 (see, Fairchild Hiller Corp. v McDonnell Douglas Corp.,
 
 28 NY2d 325;
 
 see also, Avalon, L. L. C. v Coronet Props. Co.,
 
 248 AD2d 311), it has been hesitant to find that an action
 
 is champertous as a matter of law (see, Sprung v Jaffe,
 
 3 NY2d 539 [1957];
 
 see also, Moses v McDivitt,
 
 88 NY 62 [1882]). This prudent approach is consistent with the limited scope of the champerty doctrine as it originally appeared and developed in the Anglo-American legal system.
 

 This Court’s seminal champerty case,
 
 Moses v McDivitt (supra)
 
 analyzed the actions of an attorney which, as with the current statute, were governed by a prohibition against the purchase of a claim “ ‘with the intent and for the purpose’ ” of bringing suit. This Court found that, “whether honest or reprehensible,” the primary purpose of the purchase was to coerce the debtor into transferring stock to the attorney
 
 (Moses v McDivitt, supra,
 
 at 68). Regarding the applicable statute, it stated:
 

 “This language is significant and indicates that a mere intent to bring a suit on a claim purchased does not constitute the offense; the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose. * * * To constitute the offense the primary purpose of the purchase must be to enable him to bring a suit, and the intent to bring a suit must not be merely incidental and contingent”
 
 (Moses v McDivitt,
 
 88 NY 62, 65,
 
 supra).
 

 In
 
 Sprung v Jaffe
 
 (3 NY2d 539 [1957],
 
 supra),
 
 this Court found that a triable issue of fact was raised by a defendant’s affirmative defense of champerty. The Court determined that the one nonchampertous reason proffered by the attorney seemed “totally insufficient,” and remitted for a trial
 
 (id.,
 
 at 544). This Court explained:
 

 “the statute is violated only if the primary purpose of the purchase or taking by assignment of the thing in action is to enable the attorney to commence a suit thereon. The statute does not embrace a case where some other purpose induced the purchase, and the intent to sue was merely incidental and contingent”
 
 (Sprung v Jaffe, supra,
 
 at 544, citing
 
 Moses v McDivitt,
 
 88 NY 62,
 
 supra).
 

 In
 
 Fairchild Hiller Corp. v McDonnell Douglas Corp. (supra),
 
 we first examined the actions of a nonattorney, under the
 
 *736
 
 champerty statute at issue here. Fairchild established that its acquisition of the claim was an incidental part of the transaction in which the primary purpose was to acquire the operating assets of another corporation. This Court determined that the champerty defense was properly dismissed because “the undisputed facts * * * as developed by the extensive pretrial discovery, establish that Fairchild did not receive the assignment of the claim for the
 
 sole and primary purpose
 
 of bringing an action on the assignment”
 
 (Fairchild Hiller Corp. v McDonnell Douglas Corp.,
 
 28 NY2d, at 330,
 
 supra
 
 [emphasis added]). Accordingly,
 
 Fairchild
 
 appears to have engendered the “sole purpose” versus “primary purpose” debate that fuels the legal question in this matter.
 

 Bluebird urges that the “sole” and “primary” tests are equivalent. However, UJB argues against a “sole purpose” test to determine champertous intent.
 

 We conclude that in order to constitute champertous conduct in the acquisition of rights that would then be nullified and to resolve the question at issue, the foundational intent to sue on that claim must at least have been the primary purpose for, if not the sole motivation behind, entering into the transaction. The words, “sole” and “primary,” are not synonymous generally or in law. A purpose that is the sole purpose is, by necessity, the primary purpose. However, a purpose that is primary is not necessarily the sole purpose
 
 (see, People v Lopez,
 
 73 NY2d 214, 219 [“two primary purposes”]). Yet, the distinction is one without a legal difference when the “primary” element is present. The bottom line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for
 
 the
 
 purpose (as contrasted to
 
 a
 
 purpose) of bringing an action or proceeding
 
 (compare, Moses v McDivitt, supra; Sprung v Jaffe, supra).
 
 Thus, we are satisfied that the record here does not support a finding of champerty as a matter of law for summary resolution. It cannot be determined on this record and in this procedural posture that champerty was the primary motivation, no less the sole basis, for all this strategic jockeying and financial positioning.
 

 III.
 

 The question is whether Bluebird purchased the second series certificates for the sole or primary purpose of bringing a lawsuit against the second series trustee. UJB urges the courts to examine separately Bluebird’s acquisition of the preexisting “legal rights,” as opposed to the general purchase of the certifi
 
 *737
 
 cates. UJB must make this distinction because it is not asserting that it would be improper for Bluebird to acquire a debt instrument with the intent of obtaining payment, even should litigation become necessary. However, we decline to parse the transactions in the fashion and with the legal effect proposed by UJB. That might cast the potentiality of a champerty cloud too easily over modern business practices and dispute resolutions involving the acquisition of securities and their concomitant rights
 
 (see, Elliott Assocs. v Banco de la Nacion,
 
 194 F3d 363, 379-381 [2d Cir 1999],
 
 supra).
 

 Moreover, it is not realistic to try to make the distinction that UJB urges. The fact is that Bluebird did purchase the second series certificates in their entirety, and not just the rights to a lawsuit encompassed within the expressed terms of the instrument
 
 (cf., Platt Corp. v Platt,
 
 15 NY2d 705,
 
 affg without opn
 
 21 AD2d 116;
 
 compare, Bennett ex rel. N. Y. County Lawyers’ Assn. v Supreme Enforcement Corp.,
 
 275 NY 502,
 
 affg without opn
 
 250 App Div 265). Given the range of considerations propounded by Bluebird for its purchases — as reflected in the record — we cannot discern that there was a
 
 sole
 
 purpose or even a primary purpose for the purchases as a matter of law. At least a question of fact persists as to whether Bluebird acquired the certificates with the
 
 primary
 
 purpose of suing the second series trustee.
 

 This Court has previously stated that when the “acquisition of the claim was simply an incidental part of a substantial commercial transaction,” there is no champerty
 
 (Fairchild Hiller Corp. v McDonnell Douglas Corp., supra,
 
 at 330). On this record, however, it is impossible to determine whether the acquisition of the claims against UJB was an incidental part of purchasing the second series certificates or the driving force behind the purchase.
 

 In his deposition testimony, Jack Mayer suggested various reasons for Bluebird’s purchases of the second series certificates: (1) to gain leverage to settle the priority action, which would permit final payment to first series certificate holders; (2) to profit on the second series certificates, purchased at a greatly reduced cost; and (3) to at least be economically indifferent as to the result of the priority action. Bluebird also argues that holding second series certificates could have been beneficial in the event the appeal of the Bankruptcy Court decision was successful and the value of the collateral was preserved. Bluebird argues that this pervasive profit motive removes its actions from the realm of champerty, which only
 
 *738
 
 occurs when there is no such legitimate business purpose and the sole or primary purpose is litigation, as such.
 

 By purchasing the certificates, Bluebird could have simply been covering varying risks and potentialities. Bluebird has offered an array of financial considerations justifying its purchases, including an intent to be paid some amount on the certificates. These reasons qualify as a sufficient business motivation for the purchases
 
 (cf., Sprung v Jaffe, supra).
 

 Jack Mayer admitted, however, that a lawsuit against the second series trustee over matters related to the Continental bankruptcy was a consideration at the time Bluebird began to purchase the certificates in late January 1994. While he did not believe it actually changed the rights acquired, Mayer did request the early purchases with what he acknowledged was an atypical assurance that they were purchased “with all legal rights.” Then, Bluebird brought its first lawsuit against UJB in April 1994.
 

 Thus, Bluebird first sued UJB based on its conduct during the Continental bankruptcy before payment on the second series certificates was possible (pursuant to the settlement of the priority action in December 1995). Neither the success of the priority action nor a profit or loss on the second series certificates was yet known. Bluebird then filed a State complaint against UJB before the final determination of the bankruptcy appeal in January 1997. It appears that the lawsuits were hardly incidental to or contingent on the settlement of the priority action or the outcome of the bankruptcy appeal
 
 (cf., Moses v McDivitt, supra; Fairchild Hiller Corp. v McDonnell Douglas Corp., supra).
 

 Yet, the decision to sue cannot automatically become synonymous with champerty, for litigation can be an appropriate and commonly used strategy. Further, in the face of Mr. Mayer’s testimony as to the business purposes at hand when the certificates were acquired, the timing of the lawsuits offers only competing inferential hindsight with which to challenge that testimony in a fact-resolution setting.
 

 Essentially, this case boils down to a weighing of evidence or a credibility determination, albeit within subsets of uncontested facts, regarding Bluebird’s proffered reasons for the acquisitions. Indeed, “the question of intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts”
 
 (Fairchild Hiller Corp. v McDonnell Douglas Corp., supra,
 
 at 330, citing
 
 Sprung v Jaffe, supra).
 

 
 *739
 
 In this regard, we note that the Appellate Division found evidence of a litigation-oriented “primary purpose” on the basis of a plainly mistaken fact. Bluebird’s final purchases of certificates were made within six months (not two years) of the approval of the priority action settlement in December 1995, which purchases — even UJB admits — were profitable. Furthermore, the Appellate Division made an unfavorable credibility determination regarding Bluebird’s assertion that it began purchasing the second series certificates in order to leverage the priority action. This adverse feature of the determination was inappropriate in view of the procedural posture of this case.
 

 The dismissal of the complaint as against UJB on the champerty ground, therefore, was improper, and the question remains whether it was Bluebird’s asserted business purpose or the admitted consideration of the lawsuit that constituted the primary purpose for the purchases of the second series certificates. Considering the narrow purposes of champerty and the tangled context of this case, we would not make this determination lightly. To say the least, a finding of champerty as a matter of law might engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions — a not insignificant potentiality in the State that harbors the financial capital of the world.
 

 We have considered all of UJB’s arguments, and are satisfied that, especially considering all the facts and practicalities, this matter cannot be summarily resolved at this procedural juncture on this issue presented
 
 (see, Sprung v Jaffe, supra,
 
 at 544;
 
 compare, Fairchild Hiller Corp. v McDonnell Douglas Corp., supra,
 
 at 330).
 

 Accordingly, with respect to UJB’s champerty-predicated motion to dismiss the complaint, the order of the Appellate Division should be reversed, with costs, and the motion denied.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order, insofar as appealed from, reversed, with costs, and motion by defendant United Jersey Bank to dismiss the complaint denied.