OPINION *Page 2 
{¶ 1} Defendants-appellants, Paul A. Tarman, Jr. and Amy Tarman, appeal from the March 6, 2008, Judgment Entry of the Coshocton County Court of Common Pleas finding in favor of plaintiff-appellees Marvin Lillibridge and Blake Lillibridge and granting judgment in favor of plaintiff-appellee Marvin Lillibridge and against defendants-appellants in the amount of $45,000.00.
 STATEMENT OF THE FACTS AND CASE {¶ 2} In June of 2000, appellant Amy Lanham aka Amy Tarman was involved in a motor vehicle accident that resulted in the death of one of her children and severe injuries to three others[1]. As a result of the accident, appellants filed a wrongful death and personal injury action in the Wayne County Court of Common Pleas. While the Wayne County lawsuit was pending, appellants had financial problems and, through their attorney, arranged to borrow money from appellee to tide them over until they settled their lawsuit.
 {¶ 3} On July 17, 2006, appellee Marvin Lillibridge and his minor son, appellee Blake Lillibridge, filed a complaint against appellants, alleging that appellants owed appellees $56, 502.33 plus interest and attorney fees.
 {¶ 4} On January 15, 2008, the parties filed a document captioned "Stipulations" in which they stipulated to the following:
 {¶ 5} "1. Defendants Paul Tarman and Amy Lanham, on September 27, 2001, signed a promissory note to Plaintiff Blake Lillibridge for the sum of $20,000. *Page 3 
 {¶ 6} "2. Marvin Lillibridge is the parent and natural guardian of Blake Lillibridge.
 {¶ 7} "3. On September 27, 2001, Blake Lillibridge was 9 years old.
 {¶ 8} "4. The interest rate for the September 27, 2001 promissory note was simple interest of 10% on the outstanding principal balance.
 {¶ 9} "5. On or about 8-16-02, Amy Lanham cashed a check written by Marvin Lillibridge in the amount of $600.
 {¶ 10} "6. Defendants Paul Tarman and Amy Lanham provided Plaintiff Marvin Lillibridge with a dirt bike and truck, which constituted partial payment for monies previously loaned.
 {¶ 11} "7. The value of the truck and dirt bike was agreed to be $4,000.
 {¶ 12} "8. On October 15, 2002, Defendant Amy Lanham transferred a 1998 Cadillac STS (`Cadillac') to Plaintiff Marvin Lillibridge."
 {¶ 13} "9. On October 15, 2002 the Cadillac had an odometer reading of 47,702 miles.
 {¶ 14} "10. Marvin Lillibridge has been the registered owner of the Cadillac since October 15, 2002.
 {¶ 15} "11. As of December 20, 2007, the Cadillac had an odometer reading of 79,168 miles.
 {¶ 16} "12. On or about September 26, 2003, Defendants Paul Tarman and Amy Lanham signed a $50,000 promissory note prepared by Plaintiff Marvin Lillibridge.
 {¶ 17} "13. The maturity date on the September 26, 2003 promissory note was October 10, 2003. *Page 4 
 {¶ 18} "14. Plaintiff Marvin Lillibridge sent letters to Defendants Paul Tarman and Amy Lanham requesting payment.
 {¶ 19} "15. Defendants dispute the amount Plaintiffs allege is due and owing.
 {¶ 20} "16. At all times relevant to the issues in this litigation, the property at 404 S. 8th Street, Coshocton, Ohio was owned by L F Properties, a partnership.
 {¶ 21} "17. At all times relevant to the issues in this litigation, Plaintiff Marvin Lillibridge was a partner in L F Properties.
 {¶ 22} "18. At all times relevant to the issues in this litigation, the water bill for the property at 404 S. 8th Street, was in the name of L F Properties and was never in the name of either Paul Tarman or Amy Lanham."
 {¶ 23} The following testimony was then adduced at the bench trial on the same day.
 {¶ 24} Appellee Marvin Lillibridge testified that appellants' attorney, in September of 2001, prepared a promissory note pursuant to which appellee Blake Lillibridge loaned appellants $20,000.00. The note was dated September 27, 2001. According to appellee Marvin Lillibridge, "I helped them with providing them with a $20,000.00 loan from Blake's college fund with the promise that they pay back out of their lawsuit . . ." Transcript at 13. Appellants signed the note, which provided for a 10% interest rate, and a loan disbursement document.
 {¶ 25} Appellee Marvin Lillibridge further testified that he loaned additional money to appellants after September 27, 2001, because appellants were running out of money. He testified that he wrote a check to appellee Amy Lanham aka Amy Tarman on August 16, 2002, in the amount of $600.00 and that, he advanced appellants $452.20 *Page 5 
on July 15, 2003, via a personal check from one of his companies. According to appellee Marvin Lillibridge, most of the money he loaned to appellants was in the form of cash.
 {¶ 26} On or about September 26, 2003, appellants executed a second promissory note for $50,000.00 that appellee alleged covered the additional monies that were loaned to them since the original note. The note was prepared by appellee Marvin Lillibridge. Contemporaneously, appellants also signed a letter to Home Loan Savings Bank that appellee Marvin Lillibridge had prepared in response to the Bank's concern about his own past due loan. In the letter, Lillibridge stated that he had loaned appellants $50,000.00 and expected to be repaid within the next seven to ten days. He further stated that he had advanced appellants money "over the past 2 years" for living expenses, school clothes, food and other items.
 {¶ 27} At the bench trial, appellee Marvin Lillibridge testified that he kept an accounting of all of the money that he loaned to appellants after the original $20,000.00. An accounting ledger was introduced at trial as Plaintiff's Exhibit F.
 {¶ 28} At the bench trial, appellee Marvin Lillibridge testified that he deducted $4,000.00 from the $50,000.00 owed on the second promissory note, leaving a balance of $46,000.00. In accordance with the stipulations, he testified that the $4,000.00 represented the combined values of 1996 Chevy truck and the dirt bike that were provided to him in partial payment.
 {¶ 29} At the bench trial, appellee Marvin Lillibridge was questioned about the 1998 Cadillac STS the title to which appellee Amy Tarman aka Amy Lanham had transferred to him on October 15, 2002. Appellee testified that the car had been *Page 6 
impounded and was going to be sold at auction and that the only way that appellee Paul Tarman could get the same out of the impound lot was to sell it. Appellee testified that the vehicle was transferred to him so that he could get it out of the impound lot as a purchaser and also as collateral. Appellee testified that "they needed an extra $1,000.00 a month, $550.00 was cash and $450.00 was their rent and water, which made $1,000.00 the car, was transferred over to be held as collateral." Transcript at 25. Appellee testified that he gave appellants $1,000.00 for the use of the Cadillac and that appellants were to get the car back once he was repaid.
 {¶ 30} On cross-examination, appellee Marvin Lillibridge testified that he did not have any documents signed by appellants indicating that the Cadillac was collateral or that he gave appellee Paul Tarman an additional $1,000.00 for the Cadillac. He testified that he never sold the Cadillac and that it was still titled in his name and that he had driven the same about 32,000 miles since he took title. According to appellee, the longer appellants took to pay him back, the more he got to use the Cadillac.
 {¶ 31} The following testimony was adduced when appellee was asked during cross-examination about whether the original note had a 10% interest rate:
 {¶ 32} "A. That was an acceptable interest rate for my son, yes.
 {¶ 33} "Q. What was your son's interest rate at the bank?
 {¶ 34} "A. Actually, he had money in tech stock and it was making about 18 percent until the tech stock slowed down. And at the time we looked at it, the Tarmans needed some money, it looked like an acceptable interest rate, based on availability of other investment alternatives. So it was acceptable at 10 percent. Fixed it in and that was acceptable. *Page 7 
 {¶ 35} "Q. In fact, the 10 percent was higher than what he was earning in the bank, isn't it?
 {¶ 36} "A. Within the previous 30 or 60 days, probably is correct. But it probably made 22 percent the previous year.
 {¶ 37} "Q. So you were better off giving it to the Tarmans at 10 percent than leaving it in an account that was not doing as well, correct?
 {¶ 38} "A. If the Tarmans would have paid it, it probably would have been a better investment, yes." Transcript at 40-41.
 {¶ 39} At the bench trial, appellant Paul Tarman testified that he signed a note for $20,000.00 and that once he signed the note, the money was disbursed to him. He testified that he received a $11,800.00[2]
certified check from appellee Marvin Lillibridge and that he made payments to appellee. Appellant Paul Tarman testified that a dirt bike, truck and Cadillac were given as in-kind payments. Appellant Paul Tarman testified that the Cadillac was not impounded, but was in his backyard when the same was transferred to appellee Marvin Lillibridge and that appellee agreed that the Cadillac had a fair market value of $12,000.00. When asked why the transfer documents showed the transfer to appellee being $1,000.00, appellant Paul Tarman testified that appellee did not want to pay taxes on it and requested that a lower amount be put on the transfer documents. Appellant, Paul Tarman, denied that the two ever discussed having the Cadillac returned to him. *Page 8 
 {¶ 40} Appellant Paul Tarman also testified that appellee, Marvin Lillibridge, did not advance or pay him any additional money after the first $20,000.00 or that such appellee paid any expenses on his behalf after the first note.
 {¶ 41} Testimony was adduced that, in September of 2003, appellant Paul Tarman requested additional money from appellee. Appellant Paul Tarman testified that appellee, Marvin Lillibridge, told him that if he signed the second note, he could get appellants an additional $30,000.00. By the time such note was signed, appellant had already transferred the dirt bike and truck to appellee which was together worth $16,000.00. When asked why he signed a note for $50,000.00 when he had already paid back $16,000.00, appellant Paul Tarman testified that appellee was in default on his own personal loan and needed appellant to sign the same to "clear his own butt." Transcript at 83. Appellant further testified that appellee Marvin Lillibridge did not provide any additional money to him after the second note was signed.
 {¶ 42} On cross-examination, appellant Paul Tarman admitted signing the letter to Home Loan Savings Bank attached to the $50,000.00 note. He testified that he signed the same to help appellee out with the bank. Appellant further testified that he had no documentation that the Cadillac was worth more than $1,000.00 and did not have a receipt from appellee indicating it was worth more.
 {¶ 43} Appellant Amy Tarman, who married appellant Paul Tarman in April of 2004, also testified at the bench trial. She testified that she transferred the Cadillac as payment towards the $20,000.00 note and that, although the car was worth approximately $12,000.00 to $13,000.00, "appellee approached me when I was filling out the title to put $1,000.00 because he did not want to pay the extra tax fee." *Page 9 
Transcript at 103. She further testified that after the first note, she received a $600.00 check from appellee, but no additional checks or monies. When asked why she signed the letter to Home Loan Savings Bank, appellant Amy Tarman testified that appellee, Marvin Lillibridge, said that he was in trouble with the bank and needed them to sign the same to get the bank off of his back.
 {¶ 44} At the conclusion of the bench trial, the court took the matter under advisement. Pursuant to a March 6, 2008, Judgment Entry, the trial court found in favor of appellees and granted judgment in favor of appellee Marvin Lillibridge and against appellants in the amount of $45,000.00.
 {¶ 45} Appellants now raise the following assignments of error on appeal:
 {¶ 46} "I. THE TRIAL COURT ERRED, TO THE PREJUDICE OF DEFENDANTS-APPELLANTS, BY NOT DISMISSING PLAINTIFFS-APPELLEES' CLAIM AT THE CLOSE OF PLAINTIFFS-APPELLEES' CASE IN CHIEF AND AGAIN AT THE CLOSE OF ALL EVIDENCE BASED UPON RANCMAN VS. INTERIM SETTLEMENT FUNDINGCORP. (2003) 99, OHIO ST.3D 121.
 {¶ 47} "II. THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I {¶ 48} Appellants, in their first assignment of error, argue that the trial court erred by not granting appellants' motions for a directed verdict, which were made at the close of appellees' case in chief and again at the close of all evidence, based upon the Ohio Supreme Court case of Rancman v. Interim Settlement Funding Corp. (2003),99 Ohio St.3d 121, 2003-Ohio-2721, 789 N.E.2d 217. We disagree. *Page 10 
 {¶ 49} As an initial matter, we note that because this case involved a bench trial, the rule governing directed verdicts is not applicable. SeeJarupan v. Hanna, 73 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66. In a bench trial, a defendant seeking a favorable disposition after the close of the plaintiff's case must move to dismiss under the rule governing involuntary dismissal in non-jury actions. Id. Civ. R. 41(B)(2), which governs involuntary dismissal, provides, in relevant part as follows: "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant * * * may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."
 {¶ 50} "In ruling upon a Civ. R. 41(B)(2) motion, it is the function of the trial court to review the evidence and the law. * * * In this respect, the trial court is not required to construe the evidence in favor of the non-moving party, but rather may weigh the evidence and render judgment. * * * Where plaintiff's evidence is insufficient to sustain plaintiff's burden in the matter, the trial court may dismiss the case." (Emphasis sic.) Levine v. Beckman (1988), 48 Ohio App.3d 24,27, 548 N.E.2d 267. (Citations omitted).
 {¶ 51} Appellants, in their motions, argued that any loans from appellees were void ab initio under the doctrines of champerty or maintenance. Contracts involving champerty or maintenance are void and unenforceable, Rancman v. Interim Settlement Funding Corporation,99 Ohio St.3d 121, 2003-Ohio-2721, 789 N.E.2d 217. Maintenance is rendering assistance to a litigant in pursuing or defending a lawsuit provided by someone who does not have a bona fide interest in the case, while *Page 11 
champerty is a form of maintenance in which a non-party undertakes to further another person's interest in a suit in exchange for a share if a favorable result ensues. Id. at paragraph 10.
 {¶ 52} As noted by the Ohio Supreme Court in Rancman, "[t]he doctrines of champerty and maintenance were developed at common law to prevent officious intermeddlers from stirring up strife and contention by vexatious and speculative litigation which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law." 14 Corpus Juris Secondum (1991), Champerty and Maintenance, Section 3. See, also, Bluebird Partners, L.P. v. First Fid. Bank,N.A. (2000), 94 N.Y.2d 726, 709 N.Y.S.2d 865, 731 N.E.2d 581.
 {¶ 53} "The ancient practices of champerty and maintenance have been vilified in Ohio since the early years of our statehood. Key v.Vattier (1823), 1 Ohio 132, 136, 1823 WL 8. We stated in Key that maintenance `is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression.' Id. at 143. We have held the assignment of rights to a lawsuit to be void as champerty. Brown v. Ginn (1902),66 Ohio St. 316, 64 N.E. 123, paragraph two of the syllabus. We have also said `that the law of Ohio will tolerate no lien in or out of the [legal] profession, as a general rule, which will prevent litigants from compromising, or settling their controversies, or which, in its tendencies, encourages, promotes, or extends litigation.' Davy v. Fid. Cas. Ins. Co. (1908), 78 Ohio St. 256, 268-269, 85 N.E. 504." Id at paragraphs 10-11.
 {¶ 54} In Rancman, supra, a car accident victim contacted Interim Settlement Funding Corp. prior to the resolution of her case with her insurer seeking an advance of *Page 12 
funds secured by her pending claim. Interim forwarded the victim money on two occasions, one on behalf of a second company, in exchange for money that she would collect from her insurer. If the case was not resolved in the victim's favor, the victim had no obligation under the contracts to repay the money.
 {¶ 55} The victim settled her case, but refused payment on the contracts. Instead, she tendered return of the moneys advanced to her, with interest, and then filed suit against both Interim and the second corporation, seeking revision of the contracts. The trial court found that the transactions violated usury laws and the Court of Appeals affirmed. The corporations then appealed.
 {¶ 56} In affirming the decision of the lower court, the Ohio Supreme Court, in Rancman, held, in relevant part, as follows: "The advances sub judice constitute champerty because FSF and Interim sought to profit from Rancman's case. They also constitute maintenance because FSF and Interim each purchased a share of a suit to which they did not have an independent interest; and because the agreements providedRancman with a disincentive to settle her case." Id at paragraph 14.
 {¶ 57} In Ohio Farm Bureau Federation, Inc. v. Amos, Ashland App. No. 04-COA-020, 2004-Ohio-4767, this Court addressed the issues of champerty and maintenance. In such case, appellee Ohio Farm Bureau loaned the appellants, who were farmers, money to support their peat mining operations while the farmers challenged environmental restrictions. The parties executed a loan agreement, mortgage note and mortgage. After the appellants failed to make any payments on the loan, appellee Ohio Farm Bureau filed a complaint for foreclosure, alleging that it had advanced over $500,000.00 to the appellants. After the trial court awarded summary *Page 13 
judgment to appellee Ohio Farm Bureau, the appellants appealed, arguing, in part, that the entire transaction was illegal and unenforceable under the doctrines of champerty or maintenance.
 {¶ 58} However, this Court held that the agreement was not a maintenance contract or a champerty contract. In so holding, this Court stated, in relevant part, as follows: "Appellants argue Farm Bureau selected the law firm, and maintained control over the legal action. Pursuant to the contract, Farm Bureau would not advance any additional retainer beyond the $25,000.00 without appellants' written approval, but the contract required the approval not be unreasonably withheld. In addition, appellants agreed they would not settle or dismiss their case without first consulting the Farm Bureau.
 {¶ 59} "Appellants argue it was illegal for the Farm Bureau to advance funds to initiate a lawsuit and to keep appellants' business afloat.
 {¶ 60} "Farm Bureau replies the agreement between the parties does not constitute Maintenance or Champerty because appellants were obligated to repay the loan regardless of the outcome of the case. Had the contract made repayment of the advanced funds contingent on the outcome of the case, or based upon a percentage of the proceeds, then the contract would be illegal. The contract provides the parties could `review all options available' to reduce the negative impact on appellants if their lawsuit yields no monetary judgment or a judgment insufficient to repay the loan, but, it does not make repayment of the loan contingent upon the success of the lawsuit or the amount of the repayment contingent upon the size of the recovery. *Page 14 
 {¶ 61} "We find the agreement between the parties is not a Maintenance contract or a Champerty contract, and is not void as a matter of law." Id. at paragraphs 31-34.
 {¶ 62} Appellants, in support of their oral motion at the close of appellees' case in chief, argued that appellees' loans to appellants were void as a matter of law because appellee Marvin Lillibridge testified that he "was looking solely and exclusively to the Tarman's underlying personal injury and wrongful death case for repayment . . ." Transcript at 74. We find, as in the Amos case, that repayment of the loans to appellants was not contingent on the success of their lawsuit. As noted by appellants, appellee Marvin Lillibridge testified that he expected to be repaid out of the proceeds of any settlement because he did not believe that appellants worked and thought, therefore, that "[t]hey had no other way to pay me . . ." Transcript at 51. However, nowhere in the record is there evidence that appellants were not obligated to repay the money even if they did not prevail on their lawsuit. Nor is there evidence in the record that the amount of payment was contingent upon the size of appellants' recovery. Moreover, there is no evidence that appellees took an impermissible interest in appellants' civil case.
 {¶ 63} Appellants' first assignment of error is, therefore, overruled.
 II {¶ 64} Appellants, in their second assignment of error, argue that the court's decision is against the manifest weight of the evidence. We disagree.
 {¶ 65} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Page 15 Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA5758,1982 WL 2911. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E.Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 66} At issue in the case sub judice are two alleged loans — the original loan for $20,000.00 in September of 2001 and the second alleged loan for $50,000.00 in 2003.
 {¶ 67} There is no dispute that appellees loaned appellants $20,000.00 as evidenced by the September 27, 2001, promissory note and that appellants repaid at least $4,000.00 of the $20,000.00. The parties stipulated that appellants transferred a truck and a mini bike with a combined value of $4,000.00 as payment.
 {¶ 68} As is stated above, in September of 2003, appellants also signed a second promissory note pursuant to the terms of which they promised to pay appellee Marvin Lillibridge $50,000.00 on or before October 10, 2003. At the trial in his matter, appellee Marvin Lillibridge testified that the total amount due under such note incorporated the $20,000.00 previously loaned.
 {¶ 69} Appellants argue that appellees failed to produce any evidence establishing the existence of the September 2003 loan. According to appellants, appellees "know that there is not sufficient evidence to support their allegations that they loaned [appellants] an additional $30,000.00 to support Loan #2."
 {¶ 70} However, as is stated above, appellee, Marvin Lillibridge, in addition to the promissory note signed by appellants in the amount of $50,000.00, produced a letter to his bank signed by appellants on or about September 26, 2003, stating that he had *Page 16 
loaned them $50,000.00.[3] Both the promissory note and the letter were admitted at the bench trial as exhibits. Appellee Marvin Lillibridge, in such letter, stated that he had advanced appellants money "over the past two years" for living expenses, school clothing, food and other items.
 {¶ 71} In short, based on the foregoing, we find that there was sufficient evidence establishing that appellees loaned a total of $50,000.00 to appellants. The issue thus becomes whether the trial court's award of damages to appellee, Marvin Lillibridge, in the amount of $45,000.00 was against the manifest weight of the evidence.
 {¶ 72} As is stated above, there is no dispute that appellants transferred a dirt bike and truck to appellee Marvin Lillibridge with a combined value of $4,000.000 as partial payment. Deducting this from the $50,000.00 leaves a balance of $46,000.00. Testimony also was adduced that appellant Amy Lanham aka Amy Tarman transferred a Cadillac to appellee Marvin Lillibridge. While appellee Marvin Lillibridge testified that the Cadillac was collateral for a loan, the testimony before the trial court was that he drove it approximately 32,000 miles since he took title to the same. From such testimony, it was reasonable for the trial court to conclude that the Cadillac was not collateral, but rather partial payment towards the loan. While appellee Amy Lanham aka Amy Tarman testified that the Cadillac was worth $12,000.00, the assignment of title to appellee Marvin Lillibridge lists the value of the Cadillac as $1,000.00. Thus, it was reasonable for the trial court to assign a value of $1,000.00 to the Cadillac and to disregard testimony that the same was worth $12,000.00. Deducting this $1,000.00 from the $46,000.00 results in a judgment of $45,000.00. *Page 17 
 {¶ 73} Based on the foregoing, we find that the trial court's decision is not against the manifest weight of the evidence.
 {¶ 74} Appellants' second assignment of error is, therefore, overruled.
 {¶ 75} Accordingly, the judgment of the Coshocton County Court of Common Pleas is affirmed.
Edwards, J., Wise, J., concurs and Hoffman, P.J., concurs in part, and dissents in part. *Page 19 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Coshocton County Court of Common Pleas is affirmed. Costs assessed to appellants.
[1] While one child was rendered a quadriplegic as a result of the accident, the two others suffered brain injuries.
[2] Out of the $20,000.00, $2,500.00 was a cash advance, $600.00 was paid as agreed rental balance due for 404 So. 8th and $5,100.00 was paid as agreed rental for 1 year at 404 So. 8th, leaving a balance of $11,800.00.
[3] Appellee Marvin Lillibridge provided his bank with a copy of the $50,000.00 note signed by appellants. *Page 18