Stein, J.
(dissenting). This case requires us to determine whether the transfer of notes from nonparty Deutsche Pfand-briefbank AG (DPAG) to plaintiff Justinian Capital SPC was champertous as a matter of law and, if so, whether the statutory safe harbor provision applies. Because the answer to each of these two questions depends on the intent of one or both of the parties to that transaction, and such intent is—as in almost all cases—a factual issue, I cannot agree with the majority of this Court that summary judgment is appropriate here. Therefore, I respectfully dissent.
I. Champerty
We need not travel back to feudal France or merry old England to discuss champerty. When the New York State Legislature enacted statutes prohibiting champerty, it intended to abolish the common-law version of that doctrine and, thus, our primary focus must be on the relevant statutory provisions (see Sedgwick v Stanton, 14 NY 289, 299 [1856]). Judiciary Law § 489 (1) provides that no person or corporation may buy or take an assignment of notes or other security instruments “with the intent and for the purpose of bringing an action or proceeding thereon.”* This Court has stated that “the critical issue to assessing the sufficiency of [a] champerty finding is . . . the purpose behind [the assignee’s] acquisition of rights that allowed it to sue” (Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp., 13 NY3d 190, 198 [2009] [internal quotation marks and citation omitted]). “The bottom *172 line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for the purpose (as contrasted to a purpose) of bringing an action or proceeding” (Bluebird Partners v First Fid. Bank, 94 NY2d 726, 736 [2000] [citations omitted]; see Sprung v Jaffe, 3 NY2d 539, 544 [1957]; Moses v McDivitt, 88 NY 62, 65 [1882]).
“[W]hile this Court has been willing to find that an action is not champertous as a matter of law, it has been hesitant to find that an action is champertous as a matter of law” (Bluebird Partners, 94 NY2d at 734-735 [citations omitted]). Indeed, until today, we have never found summary judgment appropriate to hold a transaction champertous as a matter of law. This hesitation is understandable because the intent and purpose of the purchaser or assignee is usually a factual question that cannot be decided on summary judgment (see Love Funding Corp., 13 NY3d at 200; Bluebird Partners, 94 NY2d at 738; Fairchild Hiller Corp. v McDonnell Douglas Corp., 28 NY2d 325, 330 [1971]).
In deciding summary judgment motions, courts should simply identify triable material issues of fact, and may not invade the province of the jury by making credibility determinations or weighing the probative force of the evidence presented by each side (see Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012]). On such a motion, the facts must be viewed in the light most favorable to the nonmoving party (here, plaintiff) (see Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 833 [2014]). Because champerty is an affirmative defense (see Bluebird Partners, 94 NY2d at 729; Fairchild Hiller Corp., 28 NY2d at 329), defendants bore the burden of demonstrating that the assignment was champertous (see Kirschner v KPMG LLP, 15 NY3d 446, 478 [2010]). I believe that, in arriving at its definitive conclusion regarding plaintiff’s sole purpose in acquiring the notes here, the majority has overlooked or disregarded these basic principles.
To be sure, the majority points to evidence in the record that would support a finding that plaintiff was a champertor, merely acting as a proxy to bring suit for DPAG. However, the record also contains evidence supporting plaintiff’s argument that it procured the notes with an intent to enforce its rights in them in whatever way possible, not necessarily by way of litigation. In fact, plaintiff affirmatively alleges that it acquired the notes for the lawful purpose of enforcing rights under them and that, while litigation on the notes was a real possibility when it took *173 the assignment, litigation was not the only option under consideration when it was negotiating for their acquisition. For example, plaintiff’s principal testified that one possible avenue to recover on the notes was through bankruptcy proceedings. In addition, the funds at issue could potentially have been restructured with some amount paid to noteholders. Alternatively, a distribution could still be forthcoming on the notes because they are not due until 2047, leaving some possibility that the notes will regain value over time.
Contrary to the majority’s assertion, discussion of these options did not constitute mere after-the-fact speculation. As relevant to the question of plaintiff’s intent when acquiring the notes, plaintiff’s principal testified that such options were among those considered as possibilities at the time plaintiff was negotiating with DPAG regarding the purchase of the notes. The principal’s use of the words “might have been” in connection with several of the options did not necessarily indicate that their pursuit was speculative; instead, such words appropriately reflected his recognition that, as a practical matter, the outcome under any option was also dependent on defendants’ responses to plaintiff’s efforts. Thus, the record contains nonspeculative evidence that options other than litigation were under consideration before plaintiff acquired the notes, notwithstanding any uncertainty about whether plaintiff would actually be successful in obtaining a recovery by pursuing them. Such evidence was sufficient to create a question of fact precluding summary judgment.
Furthermore, litigation is a legitimate consideration when acquiring any distressed debt instrument. Plaintiff commenced this litigation soon after acquiring the notes, but explained that a hasty commencement was necessary because the statute of limitations was about to run shortly after the purchase agreement was executed; this did not mean that litigation was necessarily plaintiff’s sole purpose or option. Indeed, due to the impending statute of limitations deadline, commencement of this action was necessary to protect plaintiff’s rights while it explored its other options, in case its efforts thereunder were not fruitful. The action was commenced by a summons with notice, and there is evidence that plaintiff unsuccessfully attempted to contact defendants, prior to filing the complaint, to discuss options other than protracted litigation. While defendants may dispute having received such communications from plaintiff, the courts may not, for purposes of defendants’ sum *174 mary judgment motion, make credibility determinations and must view the evidence in plaintiffs favor.
Nor does an agreement to receive a percentage share in the recovery make a transaction champertous per se (see Fairchild Hiller Corp., 28 NY2d at 328, 330 [no champerty despite 75% sharing agreement]). Here, plaintiff explained that the agreement’s adjustment to the purchase price—adding 80% or 85% of the recovery in litigation or settlement, on top of the base purchase price of $1 million—was a commercially reasonable way of structuring the sale of distressed debt instruments that are difficult to value.
Thus, even if the majority is correct that the greater weight of the evidence would support a finding of champerty, because there is conflicting evidence regarding plaintiff’s purpose in purchasing the notes, and because intent is generally a factual question, I believe it was error to grant summary judgment to defendants, finding this transaction champertous as a matter of law. I would, therefore, deny summary judgment on this factual issue and permit the parties to proceed to trial to resolve it.
II. Safe Harbor
Regardless of whether the transaction is champertous as a matter of law (as the majority has determined), or there is a question of fact regarding its allegedly champertous nature (as I have concluded), we must decide whether the safe harbor provision of Judiciary Law § 489 (2) is applicable. That provision exempts the purchase or assignment of notes or other securities from being champertous under subdivision (1) when they have “an aggregate purchase price of at least [$500,000].” I agree with the majority that this statutory language is ambiguous, and that the “purchase price” in subdivision (2) can include either actual payment of, or a binding and bona fide legal obligation to pay, at least $500,000. However, I disagree with the majority’s application of that provision to find, as a matter of law, that the purchase price set forth in the agreement here did not constitute a binding and bona fide obligation on plaintiff’s part.
It is generally inadvisable for courts to look beyond the four corners of a contract to ferret out whether the parties actually intended to pay the purchase price set forth therein (see Morlee Sales Corp. v Manufacturers Trust Co., 9 NY2d 16, 19-20 [1961]; Hutchison v Ross, 262 NY 381, 398 [1933]). Otherwise, *175 courts could regularly become mired down in an attempt to discern the parties’ intent when entering a contract, rather than simply applying the language employed in the contract. However, in those circumstances in which a contract is ambiguous on its face and it becomes necessary to determine the parties’ intent by resorting to extrinsic evidence, the issue becomes one for the jury and summary judgment is inappropriate (see Hartford Acc. & Indem. Co. v Wesolowski, 33 NY2d 169, 172 [1973]). Such is the case here.
The agreement at issue contains arguably inconsistent provisions, and it is unclear on its face as to whether the parties ever intended that DPAG would be able to collect the $1 million base purchase price from plaintiff absent recovery from defendants in this action. Unquestionably, if the obligation to pay was entirely contingent on a successful outcome in this litigation, it would not constitute a binding and bona fide debt. However, the agreement requires plaintiff to pay the $1 million base purchase price by a date certain, without regard to the success of this action. Although that date was five months after the execution of the agreement, the delay was arguably designed to provide plaintiff with an opportunity to raise that sizeable amount. The majority’s reference to plaintiff as a “shell company” with virtually no assets (majority op at 164; see 128 AD3d 553, 555 [1st Dept 2015]), ignores the possibility that plaintiff was capable of raising capital, which it had apparently succeeded in doing for other similar transactions. Moreover, under the contract, plaintiff’s failure to timely pay the base purchase price carried consequences, including the accrual of interest until full payment, and an increase in the purchase price adjustment from 80% to 85% of any recovery.
The majority correctly notes that the failure to timely pay the base purchase price was not designated in the contract as a default event. Contrary to the majority’s conclusory statement, however, neither this omission, nor any provision of the contract—nor even DPAG’s failure to enforce plaintiff’s obligation to pay thus far—necessarily means that the failure to pay does not constitute a breach of the agreement. A failure to perform one’s promise or contractual obligation—such as the payment of $1 million—is the very definition of a breach of contract (see Black’s Law Dictionary [10th ed 2014], breach of contract) and, therefore, need not be—and rarely is—explicitly identified as such in the contract, itself. The deposition testimony cited by the majority, wherein one of DPAG’s *176 principals indicated that he did not think plaintiff’s failure to timely pay would be a breach, is irrevelant unless the contract language is ambiguous so as to require the courts to consider extrinsic evidence to ascertain the parties’ intent. If it is necessary to review extrinsic evidence regarding intent, factual questions exist that a jury must resolve. Even then, courts interpreting the contract are not bound by that one individual’s personal opinion, but may consider it as merely some evidence of DPAG’s intent.
Here, the contract’s provision concerning the base purchase price is susceptible to an interpretation that would create an unqualified, bona fide obligation to pay $1 million. Nevertheless, as the majority points out, other provisions of the contract, such as certain limitations on DPAG’s remedies, raise questions as to whether DPAG intended to enforce its rights in the event of plaintiff’s breach of the payment provision, including whether DPAG is feasibly able to do so. In my view, these factual questions, which stem from contractual provisions that cannot fully be read in harmony, would permit the Court to look beyond the four corners of the agreement. However, I cannot agree with the majority’s conclusion that this was a “sham transaction” as a matter of law (majority op at 171).
Finally, the majority correctly notes this state’s leadership role in promoting and supporting large-scale, complex commercial markets and transactions, and recognizes that participants in such transactions are “sophisticated investors” (majority op at 169). However, in my view, the majority’s decision discourages transactions aimed at fostering accountability in commercial dealings, generally, and, in this particular case, successfully forecloses litigation against parties that are alleged to have committed fraud against all of the investors in more than one portfolio.
In sum, resolution of the questions of whether the transaction was champertous and, if' so, whether the parties’ contract included a bona fide obligation for plaintiff to pay $1 million for the notes, such that the safe harbor provision would apply, requires a factfinder to ascertain the parties’ intent, a determination that is inappropriate on a motion for summary judgment (see Love Funding Corp., 13 NY3d at 200; Bluebird Partners, 94 NY2d at 738; Fairchild Hiller Corp., 28 NY2d at 330). Accordingly, I would reverse the Appellate Division order and deny summary judgment.
*177 Judges Rivera, Abdus-Salaam, Fahey and Garcia concur; Judge Stein dissents in an opinion in which Judge Pigott concurs.
Order affirmed, with costs.

 Judiciary Law § 488 is similar, but applies only to attorneys.