■ JUSTINIAN CAPITAL SPC, for and on Behalf of BLUE HERON SEGREGATED PORTFOLIO, Appellant, v WESTLB AG, et al., Respondents. [10 NYS3d 41]—

Order, Supreme Court, New York County (Shirley Werner Kornreich, J.), entered February 25, 2014, which granted the "renewed motion to dismiss the complaint on the ground of champerty" by defendants WestLB, New York Branch and WestLB Asset Management (US) LLC, unanimously affirmed, without costs.

Defendant WestLB, New York Branch, is the New York branch office of nonparty WestLB AG, a German Bank. Defendant WestLB Asset Management (US) LLC (together with

WestLB, New York Branch, WestLB) is a subsidiary of WestLB AG. WestLB was the asset manager of two investment vehicles known as Blue Heron VI and Blue Heron VII. Nonparty Deutsche Pfandbriefbank AG (DPAG), also a German bank, is the original purchaser of certain notes issued by the Blue Heron entities.

In 2007, the Blue Heron entities collapsed and DPAG determined that it had certain claims against defendants for mismanagement. However, DPAG was reluctant to pursue its claims directly because it depended heavily on the German government for funding, and the German government owned part of WestLB. DPAG feared that if it sued WestLB directly, the German government would withhold funding, thereby "imperil[ing] [DPAG's] very existence."

Plaintiff Justinian Capital SPC is a Cayman Islands company with virtually no assets. On or about April 1, 2010, DPAG, as seller, and plaintiff, as purchaser, entered into a sale and purchase agreement (purchase agreement), pursuant to which plaintiff purported to purchase DPAG's right, title and interest in the notes, subject to various limitations detailed therein. The purchase agreement recited a purchase price of $1 million, which plaintiff never actually paid. Moreover, DPAG retained many of its rights in the notes, including those related to any litigation or settlement in connection with the notes. Notably, the purchase agreement provided that plaintiff would pay approximately 85% of any recovery on the notes to DPAG, and that if it had not yet paid the $1 million purchase price, it would be deducted from plaintiff's share of the recovery.

When plaintiff attempted to sue on the notes, defendants asserted that plaintiff's purported purchase of the notes was champertous, in violation of Judiciary Law § 489 (1). Plaintiff argues that, under Judiciary Law § 489 (2), the safe harbor provision precludes the defense of champerty in this case.

Judiciary Law § 489 (2) exempts from the general champerty statute the purchase of certain debts and related claims so long as there is an "aggregate purchase price of at least five hundred thousand dollars." Plaintiff argues that actual payment is not required, and that the mere recitation of payment, or a promise to pay, is sufficient. We disagree with plaintiff since this reading would effectively do away with champerty in New York, a doctrine the legislature chose to sustain in 2004, when it voted to adopt the safe harbor provision.

In fact, plaintiff submits the affirmation of former New York State Assembly member, Susan V. John, who sponsored the

safe harbor bill. John states that "[t]he Legislature intended to provide clear protection for transactions where a purchaser pays at least $500,000 in a single transaction or a series of transactions for the assignment or transfer of financial instruments and causes of action." She further states that the "rationale [underpinning the champerty statute] does not apply to sophisticated commercial transactions where the purchaser is paying at least half a million dollars in the aggregate for claims." John's testimony is supported by the safe harbor bill jacket, which provides that "[s]o long as the transfers of bonds and causes of action involved, in the aggregate, the payment of more than $500,000, the transfer (and the bonds and causes of action acquired) would be subject to the safe harbor." The justification presented for safe harbor was that "[b]uyers [are not inclined to] invest large sums of money on claims for the purpose of [then] spending more money on legal fees [opposing champerty defenses]." Accordingly, we conclude that the intent underlying Judiciary Law § 489 (2) requires actual payment of at least $500,000.

Plaintiff concedes that it never made the statutory minimum payment and could not obtain financing in order to do so, and the record indicates that at the time the purchase agreement was entered into, DPAG understood plaintiff to be a shell company with virtually no assets. Under these circumstances, plaintiff cannot avail itself of the safe harbor.

The Court of Appeals has stated that "the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim. What the statute prohibits . . . is the purchase of claims with the intent and for the purpose of bringing an action that [the purchaser] may involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up . . . in [an] effort to secure costs" (*Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp.*, 13 NY3d 190, 201 [2009] [internal quotation marks and citation omitted]). The purported sale of the notes is champertous since DPAG maintained significant rights in the notes and expected the lion's share of any recovery from defendants (*see Bennett v Supreme Enforcement Corp.*, 275 NY 502 [1937]; *Zindle, Inc. v Friedman's Express, Inc.*, 258 App Div 636 [1st Dept 1940]). There is every indication that plaintiff entered into the purchase agreement with the intent of pursuing litigation on DPAG's behalf in exchange for a fee; plaintiff's intent was not to enforce the notes on its own behalf (*see Trust for Certificate Holders*, at 201; *Bluebird Partners v First Fid. Bank,*

94 NY2d 726, 737-739 [2000]). Indeed, plaintiff could not enforce all of the rights under the notes, since, as the motion court noted, "No reasonable finder of fact could conclude that [plaintiff] was making a bona fide purchase of securities." (43 Misc 3d 598, 607 [2014].) On the contrary, "[t]he only reasonable way to understand the [purchase agreement] is that DPAG was subcontracting out its litigation to [plaintiff] for political reasons." (*Id.*) Accordingly, the sale of the notes violated Judiciary Law § 489 (1).

Despite plaintiff's argument otherwise, our decision in *71 Clinton St. Apts. LLC v 71 Clinton Inc.* (114 AD3d 583 [1st Dept 2014]) is not at odds with the result in this case. *71 Clinton* addressed a situation in which an assignee sought to protect an independent right of its own—not merely the right to earn a contingent fee—through the litigation. Thus, our decision in *71 Clinton* was based on the fact that the plaintiff, who had bought the debt outright, had been the assignee of a mortgage loan for value "for the purpose of enforcing a legitimate claim"—namely, "to obtain a judgment of foreclosure and sale in a proceeding that was already under way" (*id.* at 585). Concur—Mazzarelli, J.P., Sweeny, Moskowitz, Clark and Kapnick, JJ. 