This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------

No. 155
Justinian Capital SPC &c.,
          Appellant,
        v.
WestLB AG, &c., et al.,
          Respondents.



                 James J. Sabella, for appellant.
                 Christopher M. Paparella, for respondents.
                 Burford Capital LLC, amicus curiae.



DiFIORE, Chief Judge:

        The concept of champerty dates back to French feudal

times (Bluebird Partners v First Fid. Bank, 94 NY2d 726, 733-734

                           - 1 -

[2000]).  In the English legal system, the word "champart" was used "as a metaphor to indicate a disapproval of lawsuits brought 'for part of the profits' of the action" (id. at 734 [internal citations omitted]).  As we have explained, the champerty doctrine was developed "to prevent or curtail the commercialization of or trading in litigation" (id. at 729).  New York's champerty doctrine is codified at Judiciary Law § 489 (1).  As pertinent here, the statute prohibits the purchase of notes, securities, or other instruments or claims with the intent and for the primary purpose of bringing a lawsuit (see id. at 735-736).

Justinian Capital SPC, a Cayman Islands company, brings this action against WestLB AG, New York Branch and WestLB Asset Management (US) LLC (collectively, WestLB), alleging that WestLB's fraud (among other malfeasance) in managing two investment vehicles caused a steep decline in the value of notes purchased by nonparty Deutsche Pfandbriefbank AG (DPAG).  Justinian acquired the notes from DPAG days before it commenced this action.

In this appeal, we must first decide whether Justinian's acquisition of the notes from DPAG is champertous as a matter of law.  If the answer is "yes," we must then decide whether the acquisition falls within the champerty statute's safe harbor provision codified at Judiciary Law § 489 (2).  The safe harbor provides that the champerty doctrine of section 489 (1) is

inapplicable when the notes or other securities are acquired for "an aggregate purchase price of at least five hundred thousand dollars" (Judiciary Law § 489 [2]).

As set forth below, we hold that Justinian's acquisition of the notes was champertous and, further, that Justinian is not entitled to the protection of the safe harbor provision.  Therefore, the order of the Appellate Division should be affirmed.

I.

In 2003, nonparty DPAG invested close to 180 million euros (approximately $209 million) in notes (the Notes) issued by two special purpose companies, Blue Heron VI Ltd. and Blue Heron VII Ltd. (collectively, the Blue Heron Portfolios).  The Blue Heron Portfolios were sponsored and managed by defendants WestLB. By January 2008, the Notes had lost much (if not all) of their value.

After the value of the Notes declined, DPAG considered its options.  In the summer of 2009, DPAG's board of directors approved filing a direct lawsuit against WestLB.  Both DPAG and WestLB are German banks and, at the time, DPAG was receiving substantial support from the German government and WestLB was partly owned by the government.  Because of these relationships the DPAG board expressed concerns about pursuing a direct action to vindicate its rights for fear that the government would withdraw support from DPAG if it sued WestLB.  This fear of

repercussions from bringing a direct lawsuit led DPAG to consider another option in which a third party would bring the lawsuit and remit a portion of any proceeds to DPAG. In February 2010, DPAG discussed this option with plaintiff Justinian, a Cayman Islands shell company with little or no assets. A presentation submitted by Justinian in this action described Justinian's business plan as:

> (1) purchase an investment that has suffered a major loss from a company so that the company does not need to report such loss on its balance sheet; (2) commence litigation to recover the loss on the investment; (3) remit the recovery from such litigation to the company, minus a cut taken by Justinian; and (4) partner with specific law firms . . . to conduct litigation.

Ultimately, the DPAG board approved the option of having Justinian bring suit because it presented the "best risk return profile" for DPAG.

In April 2010, DPAG and Justinian entered into a sale and purchase agreement (the Agreement). Pursuant to the Agreement, DPAG would assign the Notes to Justinian and Justinian would agree to pay DPAG a base purchase price of $1,000,000 (representing $500,000 for the Blue Heron VI notes and $500,000 for the Blue Heron VII notes). The Notes were assigned to Justinian shortly after execution of the Agreement. The assignment, however, was not contingent on Justinian's payment of the $1,000,000. Nor did Justinian's failure to pay the $1,000,000 constitute an Event of Default under section 9 of the

Agreement.  According to Justinian's principal and chief negotiator of the Agreement, Thomas Lowe, Justinian's failure to pay the $1,000,000 did not constitute a breach of the Agreement. Under the terms of the Agreement, the only consequences of Justinian's failure to pay by the selected due date appear to be that interest would accrue on the $1,000,000 and that Justinian's share of any proceeds recovered from the lawsuit would be reduced from 20% to 15%.  Justinian has not paid any portion of the $1,000,000 base purchase price, and DPAG has not demanded payment.

Within days after the Agreement was executed and shortly before the statute of limitations was to expire, Justinian filed a summons with notice in Supreme Court commencing this action against WestLB.[1]  The subsequent complaint alleged causes of action in breach of contract, fraud, breach of fiduciary duty, negligence, negligent misrepresentation, and breach of the covenants of good faith and fair dealing, all in connection with WestLB's alleged purchase of ineligible assets for the Blue Heron Portfolios that caused the value of the Notes to deteriorate.

WestLB moved to dismiss, alleging that Justinian lacked standing to bring this action.  Justinian opposed the motion.  In reply, WestLB raised the affirmative defense of champerty,

---

[1]  Brightwater Capital Management LLC was also named as a defendant, but was dismissed from the case by Supreme Court.

arguing that Justinian's acquisition of the Notes was champertous under Judiciary Law § 489. After oral argument, Supreme Court issued a written decision concluding that there were "questions of fact surrounding Justinian's actual purpose and intent in purchasing [the Notes] that require further discovery to resolve" (37 Misc 3d 518, 528 [Sup Ct, NY County 2012]). The court ordered discovery limited to the issues related to champerty and reserved judgment on the motion to dismiss.

After champerty-related discovery was complete, WestLB renewed its motion to dismiss, which Supreme Court treated as a motion for summary judgment. Supreme Court dismissed the complaint, concluding that the Agreement was champertous because Justinian had not made a bona fide purchase of the Notes and was, therefore, suing on a debt it did not own. Supreme Court also concluded that Justinian was not entitled to the protection of the champerty safe harbor of Judiciary Law § 489 (2) because Justinian had not made an actual payment of $500,000 or more (43 Misc 3d 598 [Sup Ct, NY County 2014]). On appeal, the Appellate Division affirmed, largely adopting the rationale of Supreme Court (128 AD3d 553 [1st Dept 2015]). This Court granted leave to appeal (25 NY3d 914 [2015]). We affirm, although our reasoning is somewhat different.

## II.

Judiciary Law § 489 is New York's champerty statute. Section 489 (1) restricts individuals and companies from

purchasing or taking an assignment of notes or other securities "with the intent and for the purpose of bringing an action or proceeding thereon" (Judiciary Law § 489 [1]).

In a prominent early champerty case, Moses v McDivitt (88 NY 62, 65 [1882]), we concluded that the language "with the intent and for the purpose" contained in a predecessor champerty statute[2] -- language which Judiciary Law § 489 (1) has retained -- was significant. We determined that simply intending to bring a lawsuit on a purchased security is not champerty, but when the purchase of a security was "made for the very purpose of bringing such suit" that is champerty because "this implies an exclusion of any other purpose" (88 NY at 65). Therefore, we held that "[t]o constitute the offense [of champerty] the *primary purpose* of the purchase must be to enable [one] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent" (id. [emphasis added]). The primary purpose test articulated in Moses has been echoed in our courts for well over a century. In Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp. (13 NY3d 190, 198-199 [2009]), we endorsed the distinction in Moses "between acquiring a thing in action in order to obtain costs and acquiring it in order to protect an independent right of the assignee" and opined that "the purpose

---

[2] Section 71 of art. 3, title 2, chap. 3, part III of the Revised Statutes.

behind [the plaintiff's] acquisition of rights" is the critical issue in assessing whether such acquisition is champertous. Similarly, in <u>Bluebird Partners v First Fid. Bank</u> (94 NY2d 726, 736 [2000]), we held that "in order to constitute champertous conduct in the acquisition of rights . . . the foundational intent to sue on that claim must at least have been the primary purpose for, if not the sole motivation behind, entering into the transaction."[3]

Here, the impetus for the assignment of the Notes to Justinian was DPAG's desire to sue WestLB for causing the Notes' decline in value and not be named as the plaintiff in the lawsuit. Justinian's business plan, in turn, was acquiring investments that suffered major losses in order to sue on them,

---

[3] We reject Justinian's contention that Judiciary Law § 489 has no application unless the underlying claim is frivolous or was brought by Justinian to secure "costs." Justinian's contention is based on certain language in <u>Love Funding</u>. However, nothing in <u>Love Funding</u> or any of our previous cases stands for the proposition that champerty turns on whether the underlying claim is frivolous, nor does Judiciary Law § 489 require the claim to be frivolous for the prohibition against champerty to apply. Indeed, we make no such finding as to the merits of this lawsuit. The reference in <u>Love Funding</u> to litigation being "'stirred up . . . in [an] effort to secure costs,'" (<u>Love Funding</u>, 13 NY3d at 201, quoting <u>Wightman v Catlin</u>, 113 App Div 24, 28 [2d Dept 1906]), harks back to earlier cases, from before 1907, when "the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, *which, at the time, included attorneys' fees*" (<u>Bluebird Partners</u>, 94 NY2d at 734 [emphasis added]). Thus, the reference to champerty as a vehicle to obtain costs has no application to a company such as Justinian, which is not a law firm and would not obtain attorneys' fees by virtue of bringing the lawsuit.

and it did so here within days after it was assigned the Notes. Contrary to the suggestion by the dissent, there was no evidence, even following completion of champerty-related discovery, that Justinian's acquisition of the Notes was for any purpose other than the lawsuit it commenced almost immediately after acquiring the Notes (dissenting op. at 3-4). Justinian's principal speculated at his deposition as to other possible sources of recovery on the Notes -- for example, that there "might have been" an insolvency or that there "might have been" a restructuring or distribution between the time of acquisition and 2047 when the Notes were due. Such speculation does not suffice to defeat summary judgment. We have long held that "'[m]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient'" to defeat summary judgment (Gilbert Frank Corp. v Federal Ins. Co., 70 NY2d 966, 967 [1988], quoting Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). Indeed, "[t]he moving party need not specifically disprove every remotely possible state of facts on which its opponent might win" to defeat summary judgment, particularly when the opponent's "theorizing" is "farfetched" (Ferluckaj v Goldman Sachs & Co., 12 NY3d 316, 320 [2009]). Here, the lawsuit was not merely an incidental or secondary purpose of the assignment, but its very essence. Justinian's sole purpose in acquiring the Notes was to bring this action and hence, its acquisition was champertous.

III.

Conduct that is champertous under Judiciary Law § 489 (1) is nonetheless permissible if it falls within the safe harbor provision of Judiciary Law § 489 (2). Section 489 (2) exempts the purchase or assignment of notes or other securities from the restrictions of section 489 (1) when the notes or other securities "hav[e] an aggregate purchase price of at least five hundred thousand dollars" (Judiciary Law § 489 [2]). Here, although the price listed in the Agreement, $1,000,000, satisfies the threshold dollar amount for the safe harbor, Justinian has not actually paid any portion of that price. Justinian argues that a binding obligation to pay is sufficient to receive the protection of the safe harbor. WestLB argues that in order to come within the safe harbor an actual payment of at least $500,000 must have been made. The courts below endorsed WestLB's position. We do not agree. Actual payment of the purchase price need not have occurred to receive the protection of the safe harbor. Nonetheless, for the reasons set forth below, under the circumstances presented here, Justinian is not entitled to the protection of the safe harbor.

The parties disagree about whether the phrase "purchase price" in section 489 (2) is ambiguous. Justinian argues that it is unambiguous and means whatever amount is denominated the "purchase price" in a purchase agreement. WestLB argues that reading "purchase price" with "'absolute literalness'" would

violate the safe harbor's "'purpose and intent'" (respondents'
brief at 14, quoting Matter of Long v Adirondack Park Agency, 76
NY2d 416, 420 [1990]).  We agree with that statement.

Although the phrase "purchase price" may be unambiguous
in some contexts, here it is not, and we must look to the
legislative history to discern its meaning (see Matter of
Auerbach v Board of Educ. of City School Dist. of City of N.Y.,
86 NY2d 198, 204 [1995]).  A review of draft versions of the safe
harbor legislation introduced during the legislative session
reveals that at least one version of the bill contemplated that
the safe harbor would protect a purchaser of notes or securities
if *either* the aggregate face amount of the notes or securities
sued upon totaled at least $1,000,000 *or* the purchaser had paid,
in the aggregate, at least $500,000 to acquire them (2003 NY
Senate Bill 2992-A).  The statute as enacted contained different
language, requiring instead that the notes or securities have "an
aggregate purchase price" of at least $500,000 (Judiciary Law §
489 [2]).  The "purchase price" language effectively falls
between the two earlier proposed safe harbor formulations --
strong indication that the Legislature did not intend either that
actual payment necessarily had to have been made or that face
value alone would suffice to obtain the protection of the safe
harbor.

The legislative explanation of the safe harbor's
purpose further supports our reading.  New York has long been a

leading commercial center, and our statutes and jurisprudence have, over many years, greatly enhanced New York's leadership as the center of commercial litigation.  The safe harbor was enacted to exempt large-scale commercial transactions in New York's debt-trading markets from the champerty statute in order to facilitate the fluidity of transactions in these markets (see Assembly Mem in Support, Bill Jacket, L 2004, ch 394).  The participants in commercial transactions and the debt markets are sophisticated investors who structure complex transactions.  Requiring that an actual payment of at least $500,000 have been made for these transactions to fall within the safe harbor would be overly restrictive and hinder the legislative goal of market fluidity. The phrase "purchase price" in section 489 (2) is better understood as requiring a binding and bona fide obligation to pay $500,000 or more for notes or other securities, which is satisfied by actual payment of at least $500,000 or the transfer of financial value worth at least $500,000 in exchange for the notes or other securities.  Such understanding conforms with the realities of these markets in which payment obligations may be structured in various forms, whether by exchange of funds, forgiveness of a debt, a promissory note, or transfer of other collateral.  We emphasize that we find no problem with parties structuring their agreements to meet the safe harbor's requirements, so long as the $500,000 threshold is met, as set forth above.

However, as the dissent concedes, "[u]nquestionably, if the obligation to pay [at least $500,000] [i]s entirely contingent on a successful outcome in [the] litigation, it [does] not constitute a binding and bona fide debt" (dissenting op. at 8). The legislative history reveals that a purchase price of at least $500,000 was selected because the Legislature took comfort that buyers of claims would "not invest large sums of money" to pursue litigation unless the buyers believed in the value of their investments (see Assembly Mem in Support, Bill Jacket, L 2004, ch 394). This comfort is lost when a purchaser of notes or other securities structures an agreement to make payment of the purchase price contingent on a successful recovery in the lawsuit; such an arrangement permits purchasers to receive the protection of the safe harbor without bearing any risk or having any "skin in the game," as the Legislature intended. The Legislature intended that those who benefit from the protections of the safe harbor have a binding and bona fide obligation to pay a purchase price of at least $500,000, irrespective of the outcome of the lawsuit.

That is precisely what is lacking here. The record establishes, and we conclude as a matter of law, that the $1,000,000 base purchase price listed in the Agreement was not a binding and bona fide obligation to pay the purchase price other than from the proceeds of the lawsuit. The Agreement was structured so that Justinian did not have to pay the purchase

price unless the lawsuit was successful, in litigation or in settlement.  The due date listed for the purchase price was artificial because failure to pay the purchase price by this date did not constitute a default or a breach of the Agreement.  The Agreement permitted Justinian to exercise the option to let the due date pass without consequence and simply deduct the $1,000,000 (plus interest) from its share of any proceeds from the lawsuit.

In sum, we hold that because the Notes were acquired for the sole purpose of bringing litigation, the acquisition was champertous.  Further, because Justinian did not pay the purchase price or have a binding and bona fide obligation to pay the purchase price of the Notes independent of the successful outcome of the lawsuit, Justinian is not entitled to the protection of the safe harbor.  In essence, the Agreement at issue here was a sham transaction between the owner of a claim which did not want to bring it (DPAG) and an undercapitalized assignee which did not want to assume the $500,000 risk required to qualify for the safe harbor protection of section 489 (2) (Justinian).

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Justinian Capital SPC v WestLB AG

No. 155


STEIN, J.(dissenting):

This case requires us to determine whether the transfer of notes from nonparty Deutsche Pfandbriefbank AG (DPAG) to plaintiff Justinian Capital SPC was champertous as a matter of law and, if so, whether the statutory safe harbor provision applies. Because the answer to each of these two questions depends on the intent of one or both of the parties to that transaction, and such intent is -- as in almost all cases -- a factual issue, I cannot agree with the majority of this Court that summary judgment is appropriate here. Therefore, I respectfully dissent.

## I. <u>Champerty</u>

We need not travel back to feudal France or merry old England to discuss champerty. When the New York State Legislature enacted statutes prohibiting champerty, it intended to abolish the common-law version of that doctrine and, thus, our primary focus must be on the relevant statutory provisions (<u>see</u> <u>Sedgwick v Stanton</u>, 14 NY 289, 299 [1856]). Judiciary Law § 489 (1) provides that no person or corporation may buy or take an assignment of notes or other security instruments "with the intent and for the purpose of bringing an action or proceeding

- 1 -

thereon."[1]  This Court has stated that "the critical issue to assessing the sufficiency of [a] champerty finding is . . . the purpose behind [the assignee's] acquisition of rights that allowed it to sue" (Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp., 13 NY3d 190, 198 [2009] [internal quotation marks and citation omitted]).  "The bottom line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for the purpose (as contrasted to a purpose) of bringing an action or proceeding" (Bluebird Partners v First Fid. Bank, 94 NY2d 726, 736 [2000] [citations omitted]; see Sprung v Jaffe, 3 NY2d 539, 544 [1957]; Moses v McDivitt, 88 NY 62, 65 [1882]).

"[W]hile this Court has been willing to find that an action is not champertous as a matter of law, it has been hesitant to find that an action is champertous as a matter of law" (Bluebird Partners, 94 NY2d at 734-735 [internal citations omitted]).  Indeed, until today, we have never found summary judgment appropriate to hold a transaction champertous as a matter of law.  This hesitation is understandable because the intent and purpose of the purchaser or assignee is usually a factual question that cannot be decided on summary judgment (see Love Funding Corp., 13 NY3d at 200; Bluebird Partners, 94 NY2d at

---

[1] Judiciary Law § 488 is similar, but applies only to attorneys.

738; <u>Fairchild Hiller Corp. v McDonnell Douglas Corp.</u>, 28 NY2d 325, 330 [1971]).

In deciding summary judgment motions, courts should simply identify triable material issues of fact, and may not invade the province of the jury by making credibility determinations or weighing the probative force of the evidence presented by each side (<u>see</u> <u>Vega v Restani Constr. Corp.</u>, 18 NY3d 499, 505 [2012]). On such a motion, the facts must be viewed in the light most favorable to the nonmoving party (here, plaintiff) (<u>see</u> <u>Jacobsen v New York City Health & Hosps. Corp.</u>, 22 NY3d 824, 833 [2014]). Because champerty is an affirmative defense (<u>see</u> <u>Bluebird Partners</u>, 94 NY2d at 729; <u>Fairchild Hiller Corp.</u>, 28 NY2d at 329), defendants bore the burden of demonstrating that the assignment was champertous (<u>see</u> <u>Kirschner v KPMG LLP</u>, 15 NY3d 446, 478 [2010]). I believe that, in arriving at its definitive conclusion regarding plaintiff's sole purpose in acquiring the notes here, the majority has overlooked or disregarded these basic principles.

To be sure, the majority points to evidence in the record that would support a finding that plaintiff was a champertor, merely acting as a proxy to bring suit for DPAG. However, the record also contains evidence supporting plaintiff's argument that it procured the notes with an intent to enforce its rights in them in whatever way possible, not necessarily by way of litigation. In fact, plaintiff affirmatively alleges that it

acquired the notes for the lawful purpose of enforcing rights under them and that, while litigation on the notes was a real possibility when it took the assignment, litigation was not the only option under consideration when it was negotiating for their acquisition. For example, plaintiff's principal testified that one possible avenue to recover on the notes was through bankruptcy proceedings. In addition, the funds at issue could potentially have been restructured with some amount paid to note holders. Alternatively, a distribution could still be forthcoming on the notes because they are not due until 2047, leaving some possibility that the notes will regain value over time.

Contrary to the majority's assertion, discussion of these options did not constitute mere after-the-fact speculation. As relevant to the question of plaintiff's intent when acquiring the notes, plaintiff's principal testified that such options were among those considered as possibilities at the time plaintiff was negotiating with DPAG regarding the purchase of the notes. The principal's use of the words "might have been" in connection with several of the options did not necessarily indicate that their pursuit was speculative; instead, such words appropriately reflected his recognition that, as a practical matter, the outcome under any option was also dependent on defendants' responses to plaintiff's efforts. Thus, the record contains non-speculative evidence that options other than litigation were

under consideration before plaintiff acquired the notes, notwithstanding any uncertainty about whether plaintiff would actually be successful in obtaining a recovery by pursuing them. Such evidence was sufficient to create a question of fact precluding summary judgment.

Furthermore, litigation is a legitimate consideration when acquiring any distressed debt instrument.  Plaintiff commenced this litigation soon after acquiring the notes, but explained that a hasty commencement was necessary because the statute of limitations was about to run shortly after the purchase agreement was executed; this did not mean that litigation was necessarily plaintiff's sole purpose or option. Indeed, due to the impending statute of limitations deadline, commencement of this action was necessary to protect plaintiff's rights while it explored its other options, in case its efforts thereunder were not fruitful.  The action was commenced by a summons with notice, and there is evidence that plaintiff unsuccessfully attempted to contact defendants, prior to filing the complaint, to discuss options other than protracted litigation.  While defendants may dispute having received such communications from plaintiff, the courts may not, for purposes of defendants' summary judgment motion, make credibility determinations and must view the evidence in plaintiff's favor.

Nor does an agreement to receive a percentage share in the recovery make a transaction champertous per se (see Fairchild

<u>Hiller Corp.</u>, 28 NY2d at 328, 330 [no champerty despite 75% sharing agreement]). Here, plaintiff explained that the agreement's adjustment to the purchase price -- adding 80% or 85% of the recovery in litigation or settlement, on top of the base purchase price of $1 million -- was a commercially reasonable way of structuring the sale of distressed debt instruments that are difficult to value.

Thus, even if the majority is correct that the greater weight of the evidence would support a finding of champerty, because there is conflicting evidence regarding plaintiff's purpose in purchasing the notes, and because intent is generally a factual question, I believe it was error to grant summary judgment to defendants, finding this transaction champertous as a matter of law. I would, therefore, deny summary judgment on this factual issue and permit the parties to proceed to trial to resolve it.

## II. <u>Safe Harbor</u>

Regardless of whether the transaction is champertous as a matter of law (as the majority has determined), or there is a question of fact regarding its allegedly champertous nature (as I have concluded), we must decide whether the safe harbor provision of Judiciary Law § 489 (2) is applicable. That provision exempts the purchase or assignment of notes or other securities from being champertous under subdivision (1) when they have "an aggregate purchase price of at least [$500,000]." I agree with

the majority that this statutory language is ambiguous, and that the "purchase price" in subdivision (2) can include either actual payment of, or a binding and bona fide legal obligation to pay, at least $500,000. However, I disagree with the majority's application of that provision to find, as a matter of law, that the purchase price set forth in the agreement here did not constitute a binding and bona fide obligation on plaintiff's part.

It is generally inadvisable for courts to look beyond the four corners of a contract to ferret out whether the parties actually intended to pay the purchase price set forth therein (see Morlee Sales Corp. v Manufacturers Trust Co., 9 NY2d 16, 19-20 [1961]; Hutchison v Ross, 262 NY 381, 398 [1933]). Otherwise, courts could regularly become mired down in an attempt to discern the parties' intent when entering a contract, rather than simply applying the language employed in the contract. However, in those circumstances in which a contract is ambiguous on its face and it becomes necessary to determine the parties' intent by resorting to extrinsic evidence, the issue becomes one for the jury and summary judgment is inappropriate (see Hartford Acc. & Indem. Co. v Wesolowski, 33 NY2d 169, 172 [1973]). Such is the case here.

The agreement at issue contains arguably inconsistent provisions, and it is unclear on its face as to whether the parties ever intended that DPAG would be able to collect the $1

million base purchase price from plaintiff absent recovery from defendants in this action. Unquestionably, if the obligation to pay was entirely contingent on a successful outcome in this litigation, it would not constitute a binding and bona fide debt. However, the agreement requires plaintiff to pay the $1 million base purchase price by a date certain, without regard to the success of this action. Although that date was five months after the execution of the agreement, the delay was arguably designed to provide plaintiff with an opportunity to raise that sizeable amount. The majority's reference to plaintiff as a "shell company" with virtually no assets (majority op at 3-4; see 128 AD3d 553, 555 [1st Dept 2015]), ignores the possibility that plaintiff was capable of raising capital, which it had apparently succeeded in doing for other similar transactions. Moreover, under the contract, plaintiff's failure to timely pay the base purchase price carried consequences, including the accrual of interest until full payment, and an increase in the purchase price adjustment from 80% to 85% of any recovery.

The majority correctly notes that the failure to timely pay the base purchase price was not designated in the contract as a default event. Contrary to the majority's conclusory statement, however, neither this omission, nor any provision of the contract -- nor even DPAG's failure to enforce plaintiff's obligation to pay thus far -- necessarily means that the failure to pay does not constitute a breach of the agreement. A failure

to perform one's promise or contractual obligation -- such as the payment of $1 million -- is the very definition of a breach of contract (see Black's Law Dictionary [10th ed 2014], breach of contract) and, therefore, need not be -- and rarely is -- explicitly identified as such in the contract, itself.  The deposition testimony cited by the majority, wherein one of DPAG's principals indicated that he did not think plaintiff's failure to timely pay would be a breach, is irrelevant unless the contract language is ambiguous so as to require the courts to consider extrinsic evidence to ascertain the parties' intent.  If it is necessary to review extrinsic evidence regarding intent, factual questions exist that a jury must resolve.  Even then, courts interpreting the contract are not bound by that one individual's personal opinion, but may consider it as merely some evidence of DPAG's intent.

Here, the contract's provision concerning the base purchase price is susceptible to an interpretation that would create an unqualified, bona fide obligation to pay $1 million. Nevertheless, as the majority points out, other provisions of the contract, such as certain limitations on DPAG's remedies, raise questions as to whether DPAG intended to enforce its rights in the event of plaintiff's breach of the payment provision, including whether DPAG is feasibly able to do so.  In my view, these factual questions, which stem from contractual provisions that cannot fully be read in harmony, would permit the Court to

look beyond the four corners of the agreement.  However, I cannot agree with the majority's conclusion that this was a "sham transaction" as a matter of law (majority op at 12).

Finally, the majority correctly notes this state's leadership role in promoting and supporting large scale, complex commercial markets and transactions, and recognizes that participants in such transactions are "sophisticated investors" (majority op at 10).  However, in my view, the majority's decision discourages transactions aimed at fostering accountability in commercial dealings, generally, and, in this particular case, successfully forecloses litigation against parties that are alleged to have committed fraud against all of the investors in more than one portfolio.

In sum, resolution of the questions of whether the transaction was champertous and, if so, whether the parties' contract included a bona fide obligation for plaintiff to pay $1 million for the notes, such that the safe harbor provision would apply, requires a factfinder to ascertain the parties' intent, a determination that is inappropriate on a motion for summary judgment (see Love Funding Corp., 13 NY3d at 200; Bluebird Partners, 94 NY2d at 738; Fairchild Hiller Corp., 28 NY2d at 330).  Accordingly, I would reverse the Appellate Division order and deny summary judgment.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Order affirmed, with costs.  Opinion by Chief Judge DiFiore.
Judges Rivera, Abdus-Salaam, Fahey and Garcia concur.  Judge
Stein dissents in an opinion in which Judge Pigott concurs.

Decided October 27, 2016